James R. Marsh
Bar ID: 436448
Marsh Law Firm PLLC
P.O. Box 4668 #65135
New York, NY 10163-4668
Telephone / Fax: (212) 372-3030
Email: jamesmarsh@marshlaw.us



# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| "JANE DOE" on behalf of herself and similarly situated others<br><br>Petitioner,<br><br>v.<br><br>UNITED STATES DEPARTMENT of EDUCATION and ARNE DUNCAN in his official capacity as Secretary of the United States Department of Education<br><br>Respondents. | Case: 1:14-cv-00367<br>Assigned To : Howell, Beryl A.<br>Assign. Date : 3/6/2014<br>Description: ADMIN. AGENCY REVIEW<br><br>**PETITION FOR WRIT OF MANDAMUS AND EQUITABLE RELIEF** |

## I. INTRODUCTION

1. This petition seeks mandamus and equitable relief pursuant to the All Writs Act, 28 U.S.C.

   § 1361, and the Administrative Procedure Act, 5 U.S.C.S. § 706(1), compelling the

   Respondent United States Department of Education (DOE) and ARNE DUNCAN in his

   official capacity to provide a prompt investigation and resolution of her complaint now

   pending before the Respondent agency, and to render a decision before March 7, 2014 when

   a new federal law takes effect that will substantially undermine Petitioner's rights.

   Alternatively, this petition seeks an order from this Court requiring Respondents to apply the

   law in effect at the time Petitioner filed her complaint with the Respondent agency even if

   Respondents resolve Petitioner's complaint after March 7, 2014.



RECEIVED
Mail Room

Angela D. Caesar, Clerk of Court
U.S. District Court, District of Columbia

2.  Petitioner filed a complaint with the Office for Civil Rights at the Department of Education

    on June 18, 2012—more than eighteen months ago—(Complaint No. 11-12-2118), pursuant

    to Title IX of the Education Amendments of 1972 and Title IV of the Civil Rights Act of

    1964. [Appendix, Document 1] That complaint alleges that the University of Virginia (UVA)

    failed to provide prompt and equitable redress in connection with its investigation and

    resolution of a matter arising out of severe sexual harassment and misconduct perpetrated

    against Petitioner in December 2011. On July 27, 2012, Complaint No. 11-12-2118 was

    consolidated with an open compliance review, (Complaint No. 11-11-6001). [Appendix,

    Document 2] Petitioner was assured by the Respondent agency that the specifics of her

    complaint would be addressed and resolved.

3.  Petitioner filed a similar complaint arising out of the same underlying offense with the Office

    for Civil Rights at the Department of Health and Human Services (DHHS). That

    investigation also is still pending after more than eighteen months, and Petitioner has

    concomitant with this Petition filed a separate action in this Court seeking similar relief.

4.  The Respondents have failed to comply with their obligation under 34 C.F.R. § 106 to

    provide a prompt investigation and resolution because no action has been taken on

    Petitioner's Complaint. The substantial delay in the investigation and resolution of

    Petitioner's complaint has frustrated the non-discrimination and agency review objectives of

    Title IX, causing harm to the Petitioner and similarly situated others.

5.  Specific allegations against UVA in the underlying complaint include, but are not limited to,

    the following: UVA failed to promptly and equitably investigate and resolve Petitioner's

    complaint; UVA destroyed and/or withheld from consideration by its Sexual Misconduct

    Board (SMB) critical photographic evidence depicting Jane Doe's vaginal injuries; UVA

failed to gather and provide to the SMB relevant evidence establishing that Jane Doe was substantially incapacitated by rape drugs at the time of the incident in question, and; UVA unlawfully applied a burden of proof far stricter than the mandatory preponderance of the evidence standard.

6. Respondents were obligated to complete their investigation and resolve Petitioner's complaint promptly. The underlying incident occurred more than two years ago, in December 2011. UVA determined the underlying sexual harassment/misconduct matter in favor of the offender and against the interests and rights of Petitioner in June 2012. Petitioner immediately filed a complaint with the Respondent agency in June 2012 and has repeatedly since then expressed her concern to the Respondent that her complaint was not investigated or resolved promptly.

7. While Respondents are not subject to a specific mandatory timeframe within which such complaints must be resolved, Respondents adhere to a policy and practice of resolving Title IX complaints within 180 days and, according to Respondents' public statements, 95% of complaints are resolved within 180 days. See, http://articles.latimes.com/2007/jun/20/sports/sp-titleix20; http://www.washingtonpost.com/blogs/she-the-people/wp/2014/01/25/activists-applaud-white-house-effort-to-fight-campus-rapes/

8. Nothing appears to justify the extensive delay in this matter (or in a similar class-based policy complaint still pending after three years against Harvard Law School). Indeed, a complaint against Yale involving more than a dozen different victims was filed in March 2011, long after the much simpler policy complaint was filed against Harvard Law School in

the fall of 2010, but the Yale matter was resolved by the Respondents more than eighteen months ago, in June 2012.

9. As set forth at length below, a new federal law known popularly as the "Campus SaVE Act" (SaVE) will take effect on March 7, 2014. SaVE will substantially undermine Petitioner's rights and subject the redress of her claims now pending before the Respondent agency to less protective legal standards compared to the standards in effect at the time she filed her complaint. [Appendix, Document 3]

10. Petitioner specifically asked Respondents to resolve her complaint prior to March 7th because of the impending change in federal law. She also requested that SaVE's standards not be applied to her case irrespective of when her complaint is resolved. Petitioner asked the Respondents to confirm in writing whether a decision in her case would be issued before March 7th, but the Respondents declined to reply. Petitioner also asked Respondents to confirm in writing that SaVE's standards will not be applied to her complaint irrespective of when her complaint is resolved, but again, Respondents declined to reply. Petitioner then sent correspondence to Respondents stating that she would infer from Respondent's silence that SaVE's standards will in fact be applied to her complaint, and that if she did not hear otherwise by February 7, 2014, she will take all appropriate steps to obtain a legal remedy to protect her rights and to prevent Respondents from applying SaVE's standards to the redress of her complaint. Respondents again did not reply by February 7th or thereafter.

11. Although Respondents failed to respond to Petitioner's inquiries about SaVE, when asked the same questions about SaVE in reference to a similar Title IX investigation now pending against Princeton University, Respondents' New York regional office replied that they could not confirm one way or the other whether SaVE's new standards will be applied if that

complaint is resolved after March 7, 2014. The complaint against Princeton was filed and opened for investigation by Respondent in the fall of 2010 and remains unresolved after more than three years.

12. A related investigation by the Respondent agency is pending against Harvard Law School. That investigation, like the one against Princeton, was also opened in the fall of 2010 and, like the case against Princeton, remains unresolved after more than three years. The investigation of Harvard Law School was opened as a policy complaint, without an actual case or controversy, on behalf of the class of people intended to be protected by Title IX. The Respondent agency agreed to determine whether certain of Harvard Law School's policies regarding the redress of violence against women were facially invalid. Those policies include: application of a standard of proof during redress proceedings more onerous than the federal law mandate of "preponderance of the evidence;" failure to provide "clear timeframes" and; failure to comply with title IX's promptness mandate by delaying grievance procedures, in some cases for more than a year, while external law enforcement matters are pending. Because the Respondents' investigation of Harvard Law School is not related to an actual case or controversy, Petitioner includes allegations about that investigation here because that investigation was opened on behalf of the class of individuals represented by Petitioner, and Petitioner is seeking relief on behalf of herself and other class members.

## II. FACTS REGARDING THE RELATIONSHIP OF PETITIONER'S RIGHTS TO THE CLASS OF INDIVIDUALS AFFECTED

13. One in four to one in five women is victimized by rape or attempted rape during college.[1] Given that approximately 916,000 women graduated from post-secondary schools in 2009,[2]

---

[1] https://www.ncjrs.gov/pdffiles1/nij/grants/221153.pdf, pp. xii-xiii and 2-1 (2007); U.S. Department of Justice Office of Community Oriented Policing Services, Acquaintance Rape of College Students,

this means about 60,000 women are victimized by rape or attempted rape during college. By comparison, about 26,000 sexual assaults occur in the military each year,[3] a number which includes not only rape and attempted rape, but also relatively minor sexual touching not rising to the level of attempted rape.[4] Approximately 30% of sexual assault victims in the general population file reports.[5] A similar number of military victims file reports.[6] The number is much lower for college victims where only 5-12% of victims file reports.[7]

14. Female students in the United States have endured pervasive unequal treatment, harassment and violence on the basis of sex throughout all levels of education.[8] Women, including female postsecondary students, suffer disproportionately high rates of domestic and dating violence,[9] sexual assault,[10] and stalking.[11] In fact, a student is more likely to be victimized by sexual assault if she attends college than if she does not.[12]

---

March 28, 2002, http://www.cops.usdoj.gov/pdf/c03021472.pdf;
https://www.ncjrs.gov/pdffiles1/nij/grants/221153.pdf.
[2] http://www.census.gov/prod/2012pubs/p20-566.pdf.
[3] An estimated 26,000 sexual assaults occurred in all branches of the military in 2012,
http://www.sapr.mil/public/docs/reports/FY12_DoD_SAPRO_Annual_Report_on_Sexual_Assault-VOLUME_ONE.pdf
[4] *Id.*
[5] http://www.rainn.org/get-information/statistics/reporting-rates
[6] http://www.usccr.gov/pubs/09242013_Statutory_Enforcement_Report_Sexual_Assault_in_the_Military.pdf, p.8.
[7] http://www.nij.gov/publications/pages/publication-detail.aspx?ncjnumber=182369 (2001) (5%);
https://www.ncjrs.gov/pdffiles1/nij/grants/221153.pdf, 5-22 (2007) (12.9%).
[8] Sadker, & Zittleman, *Still Failing at Fairness, How Gender Bias Cheats Girls and Boys in School and What We Can Do About It*, Scribner Press 2009; www.hks.harvard.edu/centers/carr/research-publications/carr-center-working-papers-series/caplan-and-ford-%22the-voices-of-diversity-%22.
[9] Women are less likely than men to be victims of violent crimes overall, but women are 5 to 8 times more likely than men to be victimized by an intimate partner. *Violence by Intimates: Analysis of Data on Crimes by Current or Former Spouses, Boyfriends, and Girlfriends*, U.S. Department of Justice, March, 1998; violence by an intimate partner accounts for about 21% of violent crime experienced by women and about 2% of the violence experienced by men. *Id.* 92% of all domestic violence incidents are committed by men against women. *Violence Against Women, Bureau of Justice Statistics*, U.S. Department of Justice, January, 1994; 84% of raped women know their assailants and 57% of rapes occur on a date. Koss, M.P. (1988). *Hidden Rape: Incidence, Prevalence and descriptive Characteristics of Sexual Aggression and Victimization in a National Sample of College Students.* In Burgess, A.W. (ed.) Sexual Assault. Vol. II. New York: Garland Pub.

15. Petitioner is among the small number of college victims who did file a report with her university. She seeks relief on her own behalf and on behalf of all female postsecondary students, to ensure that her claims, now pending before the Respondent agency, are reviewed under legal standards in effect at the time she filed her claims, and standards that comport with the Constitution. Applicable standards will substantially be affected by certain provisions of SaVE which take effect on March 7, 2014.[13]

16. Certain provisions of SaVE have the purpose and effect of subjecting the redress of violence against women at post-secondary schools to inherently unfair legal standards and standards more burdensome and less protective than those applied to the redress of violence on the basis of other protected class categories such as race, color and national origin. In so doing, SaVE violates equal protection and due process, and rights protected under Title IX of the Education Amendments of 1972 and its implementing regulation, 34 C.F.R. Part 106, (Title IX) and Title IV of the Civil Rights Act of 1964 (Title IV).[14]

---

[10] Nine out of ten rape victims are female, U.S. Department of Justice, *2003 National Crime Victimization Survey. 2003*; Women aged 16-24 are four times more likely to be raped than any other population group. Koss, M.P., *id.*

[11] 8% of women and 2% of men in the United States have been stalked at some time in their life. 78% of stalking victims identified in a survey were women, and 22 percent were men. Thus, four out of five stalking victims are women. By comparison, 94 percent of the stalkers identified by female victims and 60 percent of the stalkers identified by male victims were male. Overall, 87 percent of the stalkers identified by the victims were male. National Institute of Justice 1998. *Stalking in America: Findings from the National Violence Against Women Survey*).

[12] One in four students in the United States is victimized by rape or attempted rape during college, *see* n.1, while one in six American women is the victim of an attempted or completed rape in her lifetime. National Institute of Justice & Centers for Disease Control & Prevention. *Prevalence, Incidence and Consequences of Violence Against Women Survey. 1998*.

[13] 20 U.S.C. 1092 (2013), (modifying Section 485(f) of the Higher Education Act of 1965 (20 U.S.C. 1092(f)), and § 304 of the Violence Against Women Reauthorization Act of 2013 (hereafter "VAWA"), effective March 7, 2014. A copy of SaVE is attached hereto as Exhibit 2.

[14] Title IV prohibits discrimination in identified public entities, including schools and other "federally assisted programs," on the basis of *"race, color, sex, religion or national origin."* 42 U.S.C. §§ 2000c through 2000c-9; Equal Educational Opportunities Act of 1974, Title II, 20 U.S.C. §§ 1701-1758.

17. Long misunderstood to be primarily a sports equity rule for female athletes, Title IX expressly prohibits discrimination on the basis of sex in public schools and virtually all private schools. Discrimination on the basis of sex includes gender-motivated harassment and violence.[15] Modeled after Title VI of the Civil Rights Act of 1964 which provides that "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance," 42 U.S.C. §§ 2000d–2000d-7, Title IX uses exactly the same enabling language in forbidding discrimination "on the basis of sex" in education. Title IX specifically provides that "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance…" 20 U.S.C. § 1681(a).

18. While SaVE does not explicitly state that it applies only to "violence on the basis of sex," it is, by its terms, expressly limited to such harm because it covers only "domestic violence, dating violence, sexual assault, and stalking," which offenses are committed most often against females.[16]

19. Certain provisions of SaVE are facially unconstitutional[17] and/or unconstitutional as applied. As such, they violate Petitioner's equal protection and due process rights. Although

---

[15] *Education & Title IX,* NATIONAL WOMEN'S LAW CENTER (last visited Jan. 29, 2014), http://www.nwlc.org/our-issues/education-%2526-title-ix.

[16] *See* notes 11-13. *See also Research and Policy Analysis*, DIVISION OF THE MASSACHUSETTS EXECUTIVE OFFICE OF PUBLIC SAFETY AND SECURITY, http://www.mass.gov/eopss/agencies/ogr/research-and-policy-analysis.html.

[17] Query whether Congress even has authority to regulate violence against women. See *U.S. v. Morrison*, 529 U.S. 598 (2000); (Congress has no authority to regulate violence against women under civil rights laws or the Commerce Clause); *N'tl Federation of Independent Business v. Sebelius*, 567 U.S. ___ (2012) (Congress exceeds its authority under the Spending Clause if it imposes too heavy a burden on the states as a quid pro quo for receiving federal funds.)

constitutional claims alleging gender discrimination in larger society are subjected to somewhat less strict scrutiny ("exacting scrutiny") compared to constitutional claims alleging violations based on other protected class categories such as race, color and national origin, ("strict scrutiny"), there is no similar disparity in the standard of scrutiny when courts are examining the lawfulness of a school's administrative grievance procedures to ensure the equal treatment of females in the special environment of education.[18]

20. Whether subjected to "strict scrutiny" or "exacting scrutiny," certain provisions of SaVE violate and threaten Petitioner's rights under Title IX, Title IV, the First and Fourteenth Amendments to the United States Constitution.

### III. THE SAVE STATUTE

21. SaVE was introduced to Congress in April 2011 only days after the Respondents publicly released a "Dear Colleague Letter" (DCL) announcing new interpretive guidance articulating established standards under which postsecondary schools are obligated by federal law to

---

[18] *See Title IX Legal Manual,* THE UNITED STATES DEPARTMENT OF JUSTICE (last visited Jan. 30, 2014), http://www.justice.gov/crt/about/cor/coord/ixlegal.php (noting that "Congress consciously modeled Title IX on Title VI" and citing *Alexander v. Choate,* 469 U.S. 287, 294 (1985) (for the proposition that because Title IX and Title VI contain parallel language, the same analytic framework should apply in the context of administrative redress proceedings because both statutes were enacted to prevent unlawful discrimination and to provide remedies for the effects of past discrimination); *Justice Department Announces Investigations of the Handling of Sexual Assault Allegations by the University of Montana, the Missoula, Mont., Police Department and the Missoula County Attorney's Office,* DEPARTMENT OF JUSTICE (May 1, 2012), http://www.justice.gov/opa/pr/2012/May/12-crt-561.html (announcing Title IX compliance review and Title IV investigation of the University of Montana and noting, "Title IX of the Education Amendments of 1972 and Title IV of the Civil Rights Act of 1964 each prohibit sex discrimination, including sexual assault and sexual harassment in education programs"); *Resolution Agreement,* http://www.justice.gov/crt/about/edu/documents/montanaagree.pdf (announcing resolution agreement with the University of Montana and noting that Title IV and Title IX are subject to the same regulations to ensure enforcement of rights regarding discrimination, harassment, and violence in education "on the basis of sex." 28 C.F.R. Part 54 and 34 C.F.R. Part 106). *See also* the Civil Rights Restoration Act of 1987, which made clear that substantive standards from Title VI apply with equal force to Title IX, 20 U.S.C. § 1687; 29 U.S.C. § 794, 42 U.S.C. § 2000d-4a, and 42 U.S.C. § 6101; *1977 Report,* RAND OBJECTIVE ANALYSIS. EFFECTIVE SOLUTIONS, http://www.rand.org/content/dam/rand/pubs/reports/ 2008/R2136.pdf (1977 report examining disparities in programs and activities aimed at enforcing Title IX compared to programs and activities aimed at enforcing Title IV and noting that both statutes are equally designed to promote "sex desegregation" and "race desegregation").

respond to and redress violence on the basis of sex.[19] The DCL was the Respondent agency's

interpretation of then existing relevant civil rights laws applicable to campus-based violence

against women, particularly Title IX. SaVE by its terms modifies the "Clery Act," 20 USC

1092 (f); 34 CFR 668.46(b)(11)(vi), however Congress has broad authority to amend Title IX

by amending a related federal law, such as the Clery Act. Because SaVE covers all forms of

violence against women it clearly amends Title IX because Title IX covers the same violence.

SaVE thus threatens Petitioner's rights because the underlying incident suffered by Petitioner

was a severe sexual attack that fits the definition of "sexual assault" under SaVE as well as

the definition of "sexual harassment" under Title IX. To the extent provisions in SaVE

applicable to the redress of Petitioner's claims, and the claims of similarly situated others,

conflict with Title IX, the later enacted provisions of SaVE will prevail.

22. Before SaVE takes effect on March 7th, postsecondary schools are obligated to provide for

the "equitable" redress of student complaints alleging violence on the basis of sex.[20]

"Equitable" redress is also mandatory under Title IV[21] and Title VI.[22] An early iteration of

---

[19] U.S. DEPT. OF EDUCATION OFFICE FOR CIVIL RIGHTS, DEAR COLLEAGUE LETTER (Apr. 4, 2011), *available at* http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.html.

[20] 34 C.F.R. § 106.8 (b); *Sexual Harassment Guidance,* http://www.ed.gov/about/offices/list/ocr/docs/shguide.html.

[21] *Among the University of Montana - Missoula, the U.S. Department of Justice, Civil Rights Division, Educational Opportunities Section and the U.S. Department of Education, Office for Civil Rights,* RESOLUTION AGREEMENT, *available at*
http://www.justice.gov/crt/about/edu/documents/montanaagree.pdf (announcing resolution agreement with the University of Montana and noting that Title IV and Title IX both require "equity" and are subject to the same regulations and standards of enforcement regarding discrimination, harassment and violence in education).

[22] *Title VI Enforcement Highlights Office for Civil Rights,* U.S. DEPARTMENT OF EDUCATION (last visited Jan. 30, 2014) http://www2.ed.gov/documents/press-releases/title-vi-enforcement.pdf (repeatedly noting that Title VI requires schools to apply standard of "equity"); *Title IX Legal Manual,* THE UNITED STATES DEPARTMENT OF JUSTICE (last visited Jan. 30, 2014);
http://www.justice.gov/crt/about/cor/coord/ixlegal.php (noting that "Congress consciously modeled Title IX on Title VI" and citing *Alexander v. Choate,* 469 U.S. 287, 294 (1985) (for the proposition that because Title IX and Title VI contain parallel language, thus the same analytic framework should apply because both statutes were enacted to prevent unlawful discrimination and to provide remedies for the

SaVE expressly required schools to provide "equitable" redress,[23] but that language was removed before the bill was signed into law.[24] By removing the requirement of "equity," Congress allows and/or requires schools to provide inequitable redress[25] by applying less protective legal standards compared to the redress of violence on the basis of other protected class categories such as race, color and national origin.

23. Similar to the way in which the word "equitable" was initially included and then removed, SaVE's original language mandated application of a "preponderance of the evidence" standard in redress proceedings related to violence on basis of sex,[26] but that mandate was later removed.[27] Before SaVE takes effect, the "preponderance of the evidence" standard is mandatory for the redress of violence on the basis of sex.[28] But under SaVE, schools may apply a standard of proof more rigorous than "preponderance of the evidence."

---

effects of past discrimination).

[23] *See, e.g.,* H.R. 2016 – Campus SaVE Act, § 3,(6)-(8)(B)(v)(I)(aa),GOVTRACK.US, *available at* https://www.govtrack.us/congress/bills/112/hr2016/text (last visited Jan. 30, 2014).

[24] *See id* at 8(B)(iv)(1)(aa) ("[D]isciplinary" procedures "shall provide a prompt, fair and impartial investigation and resolution.")

[25] *See supra* U.S. DEPARTMENT OF EDUCATION, note 21. (repeatedly noting that Title VI requires schools to apply standard of "equity" in redress proceedings). *See also* 42 U.S.C. § 2000d-7 (requiring equal treatment on behalf of all protected class categories). In a section labeled "Civil rights remedies equalization," the statute provides that "(1) A State shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in Federal court for a violation of § 504 of the Rehabilitation Act of 1973 [29 U.S.C. 794], Title IX of the Education Amendments of 1972 [20 U.S.C. 1681 et seq.], the Age Discrimination Act of 1975 [42 U.S.C. 6101 et seq.], Title VI of the Civil Rights Act of 1964 [42 U.S.C. 2000d et seq.], or the provisions of any other Federal statute prohibiting discrimination by recipients of Federal financial assistance." This "Civil rights remedies equalization" mandate further states that "(2) In a suit against a State for a violation of a statute referred to in paragraph (1), remedies (including remedies both at law and in equity) are available for such a violation *to the same extent* as such remedies are available for such a violation in the suit against any public or private entity other than a State." (emphasis added).

[26] H.R. 2016 – Campus SaVE Act, § 3,(6)-(8)(B)(v)(I)(aa),GOVTRACK.US, *available at* https://www.govtrack.us/congress/bills/112/hr2016/text (last visited Jan. 30, 2014).

[27] After eliminating the specific language requiring proof by a "preponderance of the evidence," the statute was rewritten to require only that "each institution shall develop and distribute a policy regarding the procedures to be followed in the redress of violence on the basis of sex," and that such a policy shall include "a statement of the standard of evidence that will be used during any institutional conduct proceeding" related to the redress of violence on the basis of sex. § 8(A)(ii).

[28] U.S. DEPT. OF EDUCATION, OCR, Dear Colleague Letter, dated April 4, 2011, 34 CFR § 106.71.

Congressional intent on this point is confirmed by testimony noting that the "preponderance of the evidence" language was expressly removed from SaVE so as to allow schools to apply a more burdensome standard of proof in the redress of violence on the basis of sex.[29]

24. Because "equitable" redress and application of the "preponderance of the evidence" standard will remain mandatory in the redress of violence on the basis of other protected class categories such as race, color and national origin, SaVE is facially unconstitutional because it authorizes the discriminatory treatment of violence on the basis of sex. In practice, this means that if a male student is physically beaten on the basis of his national origin, officials would be obligated to resolve the matter in an "equitable" manner including application of a "preponderance of the evidence" standard. However, if exactly the same violence is perpetrated against a female student on the basis of her sex, (for example, a victim is badly beaten by an abusive boyfriend), the matter need not be resolved "equitably," and school officials would be permitted to assess the evidence under the rigorous criminal law standard of proof "beyond a reasonable doubt." Application of any standard more strict than mere preponderance would subject violence on the basis of sex to additional burdens and make such civil rights harms more difficult to prove compared to violence on the basis of other protected class categories such as race, color and national origin. Even more strangely, it would subject the redress of certain claims to absurd dual assessments. For example, if a black woman is sexually assaulted on the basis of her race and her sex at a school that opts to

---

[29] One Congressman was strikingly candid about the reason the word "equitable" was stricken: "The majority bill said that college campuses must provide for 'prompt and equitable investigation and resolution' of charges of violence or stalking. This would have codified a proposed rule of the Department of Education that would have required imposition of a civil standard or preponderance of the evidence for what is essentially a criminal charge, one that, if proved, rightly should harm reputation. But if established on a barely "more probable than not" standard, reputations can be ruined unfairly and very quickly. The substitute eliminates this provision." (Testimony of Senator Grassley, Iowa, 158 Cong Rec. S 2761, Congressional Record, Sen., 112th Congress, 2nd Session Senate, April 26, 2012; Violence Against Women Reauthorization Act of 2011, Reference: Vol. 158, No. 61).

apply a "beyond a reasonable doubt" standard under SaVE, the redress of that incident would be subjected to a "preponderance of the evidence standard" only as to those aspects of the attack that occurred on the basis of her race. Aspects of that very same attack that occurred "on the basis of sex" would be assessed under a "beyond a reasonable doubt" standard.

25. SaVE further subjects violence on the basis of sex to inequitable redress by authorizing schools to provide a non-prompt "final determination." Specifically, SaVE provides that schools must conduct a "prompt investigation and resolution"[30] of a matter involving violence on the basis of sex, but schools need not be prompt when rendering a "final determination." The obligation regarding "final determinations" is addressed separately in SaVE, apart from provisions related to "investigations and resolutions," and expressly provides that schools must develop policies that describe "possible sanctions" that "may" be imposed "following the final determination" of a grievance proceeding involving violence on the basis of sex, including "rape and acquaintance rape."[31] In practice, this means the "final determination" of a student's complaint alleging violence on the basis of her sex can remain open for years. Indeed, because SaVE imposes no time limit whatsoever on "final determinations," a complaint need not be "finally determined" until the day of graduation, if at all. This lack of promptness in "final determinations" is inherently unfair and inhibits victimized students' access to oversight agencies such as the Respondent Department of Education. Without "promptness" in the investigation, resolution and final determination, a student cannot be protected from discrimination during her education. Thus, SAVE unconstitutionally subjects violence on the basis of sex to inherently unfair standards, and

---

[30] Violence Against Women Reauthorization Act of 2013, Pub. L. No. 113-4, 127 Stat. 89 (2013).
[31] Section B(II)(ii) (Each institution shall develop and disseminate a policy to address "...possible sanctions...that such institution may impose following the final determination regarding rape, acquaintance rape, domestic violence, dating violence, sexual assault and stalking.")

standards less protective than those applicable to the redress of violence on the basis of other protected class categories such as race, color and national origin.

26. SaVE requires schools to delay notifying victims of violence on the basis of sex that there has been a change to the initial decision regarding the responsibility and/or punishment of an accused student,[32] which could be as late as the day of graduation. This means the victim is unable to defend and protect her personal and civil rights in proceedings that follow the initial decision. For example, if a student offender is found responsible after the first disciplinary hearing, but then he files an appeal or a request for rehearing, the victim will only be notified of the results of that appeal or rehearing after the change is made to the original finding. This is inherently unfair as it means that if the results become final on the day of graduation, the victim could be informed of the fact her assailant was ultimately not held responsible, and the fact that the decision is final and unreviewable, as she is literally walking across the stage to receive her diploma. This subjects violence on the basis of sex to inherently unfair standards, and less protective standards compared to the redress of violence on the basis of other protected class categories such as race, color and national origin.

27. Lack of advance notice that a change could be made to a finding of responsibility or a determination of punishment interferes with a victim's rights, including her right to be heard. For example, the scope and impact of a victim's rights under Title IX is commonly in dispute during redress proceedings, and during appeals and re-hearings. Under SaVE, a victim need not be informed that her rights are being construed or even violated in appeals and re-

---

[32] SaVE states that such notice of the *fact* that a change has occurred is to be provided to the victim only at some unspecified time "*prior* to the time the results become final," (§ III (cc)) and that notice that the change is in fact "final" need not be provided until *after* the change "becomes final." (§ III (dd)) (emphasis added).

hearings, even if the initial decision is subsequently overturned or amended because of a wrongful application of her personal or civil rights.

28. SaVE provides that the Secretary of Education "shall seek the advice and counsel of the Attorney General of the United States and the Secretary of Health and Human Services…" when "preventing and responding to" violence on the basis of sex.[33] By mandating that such "advice and counsel" be sought when "responding" to institutions of higher education about matters involving violence on the basis of sex, SaVE imposes unfair and needless burdens on students seeking to enforce their rights through the assistance of the DOE as the primary responsible federal oversight agency. This unconstitutionally subjects violence on the basis of sex to additional burdens, including needless delays, thus subjects such violence to less protective standards compared to violence on the basis of other protected class categories because such "advice and counsel" from the DOJ and DHHS is not required when the DOE is "responding" to institutions of higher education about matters involving violence on the basis of other protected class categories such as race, color and national origin.

29. SaVE authorizes schools not to comply with annual statistical reporting or respond at all to violence on the basis of sex unless such violence is actually reported to school officials or law enforcement officials.[34] While actual notice has long been required to establish a school's liability in civil proceedings, actual or constructive notice was sufficient for institutional and regulatory enforcement of civil rights laws prior to the enactment of SaVE. Constructive notice includes, for example, anonymous or third-party reports such as a newspaper story of a

---

[33] Section 16(B) ("The Secretary shall seek the advice and counsel of the Attorney General of the United States and the Secretary of Health and Human Services concerning the development, and dissemination to institutions of higher education, of best practices information about preventing and responding to incidents of [violence on the basis of sex]").

[34] Section 8(A)(ii) (Each institution shall develop and distribute a policy regarding the "procedures each institution will follow once an incident of [violence on the basis of sex has] been reported…")

fraternity party describing incidents of sexual assault.[35] By limiting schools' responsibility to matters that were actually reported, SaVE authorizes schools to subject the redress of violence on the basis of sex to less protective legal standards compared to violence on the basis of other protected class categories such as race, color and national origin, to which schools must respond and which must be measured for statistical purposes under actual and constructive notice standards. In practice this means school officials can ignore with impunity violence on the basis of sex when not reported, even if the violence is sufficiently obvious that officials "should know" or actually do know about it. However, if violence occurs on the basis of any other protected class category, such as race, color or national origin, officials must respond and measure for statistical purposes even if the incident is not reported so long as they knew or should have known that the incident occurred.[36] This will disproportionately undermine schools' response to and reporting of violence on the basis of sex because, as noted above, such violence is rarely officially reported.

30. SaVE authorizes schools not to provide statistical reporting on matters involving violence on the basis of sex unless such violence causes bodily injury.[37] While bodily injury is also required as a prerequisite to statistical reporting on matters involving violence on the basis of

---

[35] *Dear Colleague Letter*, DEPARTMENT OF EDUCATION OFFICE FOR CIVIL RIGHTS, http://www.whitehouse.gov/sites/default/files/dear_colleague_sexualviolence.pdf.

[36] In its Dear Colleague Letter of April 4, 2011, the Department of Education noted that ***constructive knowledge*** "is the standard for administrative enforcement" of civil rights laws, such as Title IX, and in court cases where Petitioners are seeking injunctive relief. *See 2001 Guidance* at ii-v, 12-13. The standard in private lawsuits for monetary damages is ***actual knowledge*** and deliberate indifference. *See Davis v. Monroe Cnty. Bd. of Ed.*, 526 U.S. 629, 643, 648 (1999)."

[37] Section f(1)(F)(IX)(ii)(Statistical reporting is required for "the crimes described in subclauses (I) through (VIII) of clause (i) of larceny-theft, simple assault, intimidation, and destruction, damage, or vandalism of property, and ***of other crimes involving bodily injury*** to any person…in which the victim is intentionally selected because of the actual or perceived race, gender, religion, national origin, sexual orientation, gender identity, ethnicity, or disability of the victim that are reported to campus security authorities or local police agencies, which data shall be collected and reported according to category of prejudice; and of ***domestic violence, dating violence, and stalking incidents that were reported to campus security authorities or local police agencies***.") (emphasis added).

other protected class categories such as race, color and national origin, this provision will disproportionately inhibit the accurate reporting of statistics involving sexual assault, which is the most common form of violence that occurs on the basis of a protected class category and it rarely causes injury.

31. SaVE authorizes schools not to provide victims with individualized and personal notice of their rights under civil rights laws unless there is an actual "report" of an incident. In practice, this means that if an official is aware that a particular student was raped at a party, but there has been no actual report of the incident, he or she would have no obligation to inform the victim of her rights. While such rights are more passively available in student handbooks, victims are more likely to report and/or assert their rights with individualized notice at a time when such rights can be understood in a personal context. Without individualized notice of rights, violence on the basis of sex is subjected to inherently unfair standards because victims are less likely to achieve effective redress on campus, or enforcement of rights via civil legal proceedings and federal and state oversight agencies.

32. Certain provisions of SaVE are facially unconstitutional to the extent they emanate from the Commerce Clause because Congress has no general authority under the Commerce Clause to regulate violence against women that occurs between private persons.[38]

33. To the extent Congress has authority to regulate violence against women under the Spending Clause, it cannot do so in a manner that intrudes unconstitutionally into the authority of the states.

34. To the extent Congress has authority to regulate violence against women, it cannot do so in an unconstitutional manner by authorizing the redress of such violence under less protective

---

[38] *See* n.19.

standards compared to the redress of violence that occurs on the basis of other protected class categories, such as race, color and national origin.

35. The Respondent Department of Education has defined violence on the basis of sex to include "rape," "sexual assault", "sexual battery", and "sexual coercion."[39] SaVE defines "sexual assault" in two distinct ways. For the purpose of annual statistical reporting of campus crimes, "sexual assault" is defined as "a forcible or nonforcible sexual offense" under the Uniform Crime Reporting System of the Federal Bureau of Investigation.[40] For the purpose of providing administrative redress proceedings on campus, "sexual assault" is defined as "any nonconsensual sexual act proscribed by Federal, tribal, or State law, including when the victim lacks capacity to consent.[41] With regard to such redress proceedings, SaVE requires schools to incorporate and apply state criminal law standards to a determination of whether violence on the basis of sex, including sexual assault, occurred.[42] While not every violation of every state's incorporated criminal code will constitute a civil rights violation, every incorporated state criminal code necessarily includes conduct that can constitute a civil rights violation.

---

[39] *See* n.21.

[40] *Criminal Justice Information Services (CJIS) Division Uniform Crime Reporting (UCR) Program*, FEDERAL BUREAU OF INVESTIGATIONS (last visited Jan. 30, 2014), http://www.fbi.gov/about-us/cjis/ucr/recent-program-updates/reporting-rape-in-2013. http://www.fbi.gov/about-us/cjis/ucr/recent-program-updates/reporting-rape-in-2013.

[41] Violence Against Women, 113 Pub. L. No. 4, 127 Stat. 54; 29 U.S.C.S. § 3925 (23); 109 Pub. L. No. 162, 119 Stat. 2960.

[42] 20 U.S.C.§ 1092 (f)(8)(B)(I)(bb) (Each institution shall develop and distribute a policy which "shall include"..."the definition of domestic violence, dating violence, sexual assault, and stalking *in the applicable jurisdiction.")* (emphasis added).

36. SaVE threatens Petitioner's rights because it allows her complaint to be redressed under Virginia's less protective state criminal law standards,[43] rather than federal law's more generous civil rights standards.

37. SaVE violates core principles of federalism and threatens the Petitioner's and all women's equal protection and due process rights by subjecting the redress of their federal claims to disparate legal standards based on which state the offense occurred in. For example, Virginia criminal law requires proof of "force,"[44] while a victim attending college in another state suffering the exact same harm would have her claims effectively redressed irrespective of proof of force.[45]

38. SaVE further threatens the Petitioner's and all women's equal protection and due process rights by authorizing the redress of federal civil rights violations under state criminal law standards because, for example, the state criminal code definition of non-consent in Virginia, as in many states, is a more rigorous standard than the federal civil rights standard of unwelcomeness."[46] SaVE does not require violence that occurs on the basis of other

---

[43] *See* Virginia Criminal Code § 18.2-61
[44] *Id.*
[45] See compilation of statutes compiled by American Prosecutors Research Institute, available at http://www.arte-sana.com/articles/rape_statutes.pdf (noting wide disparity among the states as to whether proof of force is required.)
[46] *Id.*, (noting that some states, but not all, recognize a woman saying "no" as sufficient to establish non-consent). By contrast, under federal civil rights laws, conduct is uniformly assessed under a single standard to determine whether it was "unwelcome." "Unwelcome" is defined as conduct the student "did not request or invite it and considered the conduct to be undesirable or offensive. The age of the student, the nature of the conduct, and other relevant factors affect whether a student was capable of welcoming the sexual conduct. A student's submission to the conduct or failure to complain does not always mean that the conduct was welcome." http://www2.ed.gov/about/offices/list/ocr/docs/ocrshpam.html. In its April, 2011 Dear Colleague Letter, the Department of Education noted that a single rape will suffice to constitute severe harassment. The Department also cited the following federal cases in support of its view that a single sexually offensive event not rising to the level of rape can be sufficient to constitute a civil rights harm: *Berry v. Chi. Transit Auth.*, 618 F.3d 688, 692 (7th Cir. 2010) (in the Title VII context, "a single act can create a hostile environment if it is severe enough, and instances of uninvited physical contact with intimate parts of the body are among the most severe types of sexual harassment"); *Turner v. Saloon, Ltd.*,595 F.3d 679, 686 (7th Cir. 2010) (noting that "'[o]ne instance of conduct that is sufficiently

protected class categories, such as race, color and national origin, to be assessed under state criminal law standards.

39. Assessing federal civil rights injuries under state criminal law standards subjects violence on the basis of sex to as many as fifty different state standards such that students in some states will be better protected from civil rights injuries than students in other states depending on how an offender's actions are defined by a particular state's criminal code. In practice, this means a victim who is raped on campus in a state where the criminal law definition of rape is very strict will have her redress proceedings subjected to more burdensome/less protective legal standards compared to redress proceedings on behalf of a victim in a different state who experiences exactly the same harm, only a few miles away, in a state where the criminal law definition of non-consent is less onerous. This disparate treatment of two victims who suffered exactly the same violence is unconstitutional and offends core principles of federalism by allowing state law definitions to dictate whether a federal civil rights offense occurred.[47]

40. Because SaVE covers only violence on the basis of sex, a student who endures non-violent verbal harassment will have her civil rights redressed under less burdensome/more protective standards, such as application of the "unwelcomeness" standard, compared to a student who endures a violent sexual assault, which will be redressed under more burdensome/less

---

severe may be enough,'" which is "especially true when the touching is of an intimate body part" (quoting *Jackson v. Cnty. of Racine*, 474 F.3d 493, 499 (7th Cir. 2007))); *McKinnis v. Crescent Guardian, Inc.*, 189 F. App'x 307, 310 (5th Cir. 2006) (holding that "'the deliberate and unwanted touching of [a Petitioner's] intimate body parts can constitute severe sexual harassment'" in Title VII cases (quoting *Harvill v. Westward Commc'ns, L.L.C.*, 433 F.3d 428, 436 (5th Cir. 2005))).

[47] *See* John Decker & Peter Baroni, *"No" Still Means "Yes": The Failure of the Non-Consent Reform Movement in American Rape and Sexual Assault Law*, 101 NW. J. CRIM. L. & CRIMINOLOGY 1081 (2012) (noting the wide variety of definitions of non-consent among the states such that in some states lack of affirmative consent is enough, while in others, the lack of affirmative consent is not sufficient in the absence of force).

protective standards, such as application of the state criminal law definition of "non-consent." This means violent sex offenders are less likely to be held responsible for discrimination on the basis of sex compared to non-violent verbal harassers. Notably, while SaVE requires training on state criminal law standards, it requires no training whatsoever on the civil rights standard of "unwelcomeness."

41. Because SaVE covers only violence on the basis of sex, violence on the basis of other protected class categories, such as race, color and national origin, will be assessed under more protective civil rights standards.

42. SaVE nowhere requires that procedures for redressing violence on the basis of sex afford victims the same procedural and substantive protections as those that apply to violence on the basis of other protected class categories such as race, color and national origin.

43. Alongside less protective standards, SaVE is silent on the need for schools to comply with civil rights laws at all. Indeed, SaVE lacks the kind of language, typically included and necessary in new statutes that might encroach on important rights, that would protect against unintended diminution.[48] SaVE nowhere states, for example, that nothing in the statute "shall be construed to limit or inhibit existing legal protections under Title IX, Title IV and Title VI and related regulatory schemes, guidelines, case law and interpretive guidance from the Department of Education and Department of Justice." The absence of such language ensures

---

[48] For example, in 1994, Congress amended the General Education Provisions Act (GEPA) to state that nothing in GEPA "shall be construed to affect the applicability of Title VI of the Civil Rights Act of 1964, Title IX of Education Amendments of 1972, Title V of the Rehabilitation Act of 1973, the Age Discrimination Act, or other statutes prohibiting discrimination, to any applicable program." 20 U.S.C. § 1221(d). The Department of Education has interpreted that provision to mean that the federal educational records privacy act (FERPA), which was enacted as part of GEPA, applies in the context of Title IX enforcement proceedings on campus, but if there is a conflict between the requirements of FERPA and the requirements of Title IX, such that enforcement of FERPA would interfere with the primary purpose of Title IX to eliminate sex-based discrimination in schools, the requirements of Title IX override any conflicting FERPA provisions. *See 2001 Guidance* at vii.

SaVE's discriminatory application in the redress of violence on the basis of sex such that conflicts between Title IX and SaVE will be resolved in favor of SaVE even if such resolution interferes with the primary purpose of Title IX by preventing equitable redress.

44. SaVE's requirements and enabling provisions, individually and collectively, violate various rights guaranteed to the Petitioner and similarly situated others, including rights under Title IX, Title IV and the First and Fourteenth Amendments to the United States Constitution. Relief is necessary to protect the rights of the Petitioner and all female students.

## IV. JURISDICTION AND VENUE

45. Petitioner's claims arise under Title IX of the Education Amendments of 1972, Title IV of the Civil Rights Act of 1964 the equal protection and due process clauses of the United States Constitution. Jurisdiction is conferred by 28 U.S.C. §§ 1983, 1331 and 1343(a)(3) and the Adminstrative Procedures Act, 5 U.S.C.S. § 706(1).

46. Petitioner's claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202, by Rules 57 and 65 of the Federal Rules of Civil Procedure, and by the general legal and equitable powers of this Court.

47. Venue is appropriate under 28 U.S.C. §§ 1391(b)(1), 1391(e).

## V. PARTIES

48. At all times relevant to this complaint, Jane Doe was an undergraduate student at UVA. She is currently a resident of the District of Columbia.

49. Respondent Arne Duncan is the United States Secretary of Education. His regular place of business is 400 Maryland Avenue S.W., Washington, D.C. 20202. He is sued in his official capacity and is responsible for the implementation and enforcement of Title IX and SaVE.

## VI. JURISDICTION

50. The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 20 U.S.C. §1681 and 5 U.S.C. §706 (1).

## VII. CLAIMS FOR RELIEF

### COUNT I
### MANDAMUS

51. Petitioner incorporates herein the allegations of paragraphs 1 through 50.

52. Title IX of the Education Amendments of 1972 provides that no person "shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

53. Title IX is implemented by Department of Education agency rules under Title 34 Part 106. Department of Education rule 106.31 states that a recipient of Federal funds "…shall not, on the basis of sex (1) treat one person differently from another in determining whether such person satisfies requirement or condition for the provision of such aid, benefit or service; (2) provide different aid, benefits, or services or provide aid, benefits, or services in a different manner; (3) deny any person any such aid, benefit, or service; (4) subject any person to separate or different rules of behavior, sanctions, or other treatment;…(6) Aid or perpetuate discrimination against any person by providing significant assistance to any agency, organization or person which discriminates on the basis of sex in providing any aid, benefit, or service to students or employees; (7) Otherwise limit any person in the enjoyment of any right, privilege, advantage, or opportunity."

54. 34 C.F.R. §106.1 states that it is designed to eliminate "discrimination on the basis of sex in any education program or activity receiving Federal financial assistance…"

55. 34 C.F.R. § 106.71 states that the procedural provisions applicable to Title VI of the Civil Rights Act (34 CFR §§ 100.6-100.11) are adopted and incorporated therein.

56. Department of Education rules provide that any person who believes that he or she has been subjected to discrimination may file a complaint. 34 CFR § 100.7(b). Once a complaint is filed, a prompt investigation is required. 34 CFR § 100.7(c).

57. An investigation by the Department of Education "should include, where appropriate, a review of the pertinent practices and policies of the recipient, the circumstances under which the possible noncompliance with this part occurred, and other factors relevant to a determination as to whether the recipient has failed to comply with this part." *Id.*

58. Respondent Arne Duncan as the Secretary of the Department of Education is charged with the duty of effectuating the provisions of Title IX of the Education Amendments of 1972. It is his responsibility to ensure the prompt investigations and resolutions of complaints alleging discriminatory behavior. 34 C.F.R. §100.7.

59. Respondents have jurisdiction over UVA. UVA is a public entity and academic institution that receives federal funds. As such, they must comply with the provisions of Title IX of the Education Amendments of 1972 and the corresponding regulation. 34 C.F.R. § 106.31.

60. Respondents are obligated to conduct a "prompt investigation" of Petitioner's complaint even as part of a compliance review because compliance reviews must also be prompt. 34 CFR 100.7(c).

61. Respondents have failed to carry out their duty of promptness and by such failure has caused and threatens to cause harm to Petitioner's rights and the rights of similarly situated others. A delay until after March 7, 2014 will subject the redress of claims to less legal protection and more legal burdens in violation of federal rights of Petitioner and similarly situated others.

62. Petitioner has no plain, speedy, and adequate remedy at law other than the remedies requested by this action.

63. Respondents' failure to promptly investigate and resolve Petitioner's complaint has caused and threatens to cause harm to Petitioner's rights and the rights of others, and is unlawful, unreasonable, and exceptional. As a result, Petitioner and similarly situated others have sustained, and will continue to sustain, injury and risk of injury to rights.

## COUNT II
### ADMINISTRATIVE PROCEDURES ACT

64. Petitioner incorporates herein the allegations of paragraphs 1 through 63.

65. Respondents' failure to promptly investigate and resolve Petitioner's complaint for more than eighteen months constitutes "unreasonabl[e] delay" within the meaning of 5 U.S.C. § 706(2).

66. While this Court generally lacks jurisdiction to interfere with the exercise of discretion by an agency, certain exceptional circumstances warrant judicial review. Such circumstances are present here and the Respondent agency has unreasonably delayed its investigation and resolution of Petitioner's complaint.

## COUNT III
### EQUAL PROTECTION

67. Petitioner re-alleges paragraphs 1 through 66 and incorporates the same by reference in this count.

68. Respondents have a duty to enforce laws consistent with the dictates of the Fourteenth Amendments to the United States Constitution, which guarantees Petitioner and others equal protection of the law. Public and private institutions are subject to constitutional restrictions because the Equal Protection clause has been held coextensive with civil rights laws.

69. Petitioner's equal protection rights are threatened and violated by Respondents' actions because Respondents' failure to resolve her complaint promptly will result in Respondents

resolving her complaint after March 7, 2014 when SaVE's new standards take effect. SaVE's standards allow and/or mandate the redress of Petitioner's claims and all other matters involving violence on the basis of sex under inequitable and less protective standards than standards in effect prior to March 7, 2014, and less protective than those that apply now and will continue to apply after March 7, 2104 to the redress of violence on the basis of other protected class categories such as race, color and national origin.

70. As a result, Petitioner and similarly situated others have sustained, and will continue to sustain, injury and risk of injury to such rights.

## COUNT IV
## SUBSTANTIVE DUE PROCESS

71. Petitioner re-alleges paragraphs 1 through 70 and incorporates the same by reference in this count.

72. Respondents have a duty to enforce laws consistent with the dictates of the Fourteenth Amendment to the United States Constitution, which guarantees Petitioner substantive Due Process of law.

73. Respondents' failure to provide a prompt investigation and resolution exposes Petitioner's complaint, and the complaints of others, to redress under inadequate, inequitable and unconstitutional legal burdens.

74. As a result, Petitioner and similarly situated others have sustained, and will continue to sustain, injury and risk of injury to such rights.

## COUNT V
## PROCEDURAL DUE PROCESS

75. Petitioner re-alleges paragraphs 1 through 74 and incorporates the same by reference in this count.

76. Respondents have a duty to enforce laws consistent with the dictates of the Fourteenth Amendment to the United States Constitution, which guarantees Petitioner procedural due process.

77. Petitioner's Procedural Due Process rights are threatened because she has been denied a meaningful hearing under applicable and constitutional legal standards by Respondents' delayed redress of her complaint.

78. After March 7, 2014, the due process rights of Petitioner and others will be subjected to less protective procedural standards in violation of procedural due process because SaVE substantially changes the law to allow for the application of less protective standards to Petitioner's complaint and the complaints of others.

79. As a result, Petitioner and similarly situated others have sustained, and will continue to sustain, injury and risk of injury to such rights.

## COUNT VI
## FIRST AMENDMENT

80. Petitioner re-alleges paragraphs 1 through 79 and incorporates the same by reference in this count.

81. Respondents have a duty to enforce laws consistent with the dictates of the First Amendment to the United States Constitution, which guarantees Petitioner and similarly situated others rights of speech and petition.

82. Petitioner's First Amendment rights are chilled and denied by Respondents' delayed redress of her complaint and will be further chilled after March 7, 2014 because SaVE's less protective and more burdensome standards will inhibit the reporting of matters involving violence against women.

83. As a result, Petitioner and similarly situated others have sustained, and will continue to sustain, injury and risk of injury to such rights.

## COUNT VII
## TITLE IX

84. Petitioner re-alleges paragraphs 1 through 83 and incorporates the same by reference in this count.

85. Respondents have a duty to enforce laws consistent with the dictates of Title IX of the Education Amendments of 1972, which forbids discrimination on the basis of sex, guarantees Petitioner equal access to education and mandates that postsecondary schools adopt "prompt and equitable" policies and procedures to redress discrimination on the basis of sex, including violence on the basis of sex.

86. Respondents' delayed redress of Petitioner's complaint threatens and violates Petitioner's rights and the rights of similarly situated others by subjecting the redress of her complaint and the complaints of others to less protective legal standards under SaVE.

87. SaVE will have a disparate impact on students on the basis of sex.

88. As a result, Petitioner and similarly situated others have sustained, and will continue to sustain injury and risk of injury to such rights.

## COUNT VIII
## TITLE IV

89. Petitioner re-alleges paragraphs 1 through 88 and incorporates the same by reference in this count.

90. Respondents have a duty to enforce laws consistent with Title IV of the Civil Rights Act of 1964, which forbids discrimination in public institutions on the basis of sex.

91. Respondents' delayed redress of Petitioner's complaint threatens and violates Petitioner's rights and the rights of others by subjecting violence on the basis of sex to less protective legal standards in violation of Title IV.

92. SaVE will have a disparate impact on students on the basis of sex.

93. As a result, Petitioner and similarly situated others have sustained, and will continue to sustain injury and risk of injury to such rights.

## PRAYER FOR RELIEF

WHEREFORE, Petitioner respectfully request that the Court:

1. Issue a writ of mandamus ordering Respondents to investigate and resolve her Complaint and issue a decision thereon before March 7, 2014;

2. Order that if Petitioner's complaint is not resolved until after March 7, 2014, Respondents shall not apply substantive provisions from SaVE to the resolution of Petitioner's complaint;

3. Declare identified aspects of SaVE unconstitutional and enjoin their future enforcement on behalf of Petitioner and similarly situated others.

Dated: February 20, 2014

MARSH LAW FIRM PLLC

By_____
James R. Marsh
Bar ID: 436448
P.O. Box 4668 #65135
New York, NY 10163-4668
Telephone / Fax: (212) 372-3030
Email: jamesmarsh@marshlaw.us

# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

|  |  |
|---|---|
| "Jane Doe" on behalf of herself and<br>similarly situated others<br>Petitioner,<br>v.<br><br>UNITED STATES DEPARTMENT of<br>EDUCATION and ARNE DUNCAN in his<br>official capacity as Secretary of the<br>United States Department of Education<br>Respondents. | Civil Action No._____<br><br>**APPENDIX** |

## INDEX

**DOCUMENT 1:**   June 18, 2012, Complaint filed with the United States Department

of Education

**DOCUMENT 2:**   July 27, 2012, Complaint acknowledgment from the United States

Department of Education

**DOCUMENT 3:**   Campus SaVe Act

# DOCUMENT 1

This complaint seeks a determination of whether the University of Virginia (UVA) violated Title IX, Title IV and related federal laws and standards in connection with its Sexual Misconduct Board's (SMB) handling of a matter involving allegations of serious sexual misconduct against UVA student Michael Brandon Kremer (MBK). Specifically, this complaint alleges that UVA failed to provide the complainant (hereafter "victim") with a "prompt and equitable" resolution of her sexual misconduct complaint. This complaint alleges, inter alia, that UVA destroyed and/or withheld from the SMB critical photographic evidence depicting the victim's vaginal injuries, failed to gather and provide to the SMB overwhelming evidence establishing that the victim was substantially incapacitated by rape drugs at the time of the incidents in question, and unlawfully imposed on the victim a burden of proof far stricter than the mandatory preponderance of evidence standard.

## INTRODUCTION

At the outset, it should be noted that UVA apparently provided the victim with false information regarding the actual vote of the SMB. The SMB panel was made up of five members. The written decision stated that that the board voted unanimously in favor of MBK on all but one charge, and that the panel voted 3-2 in MBK's favor on only one count. In a June 12, 2012 conversation with an SMB member, however, the victim's family learned that it was "a very close vote", a "close decision", "not unanimous" and that "a few" panel members were on the victim's "side". In fact, this person stated there "was a lot of yelling" at the end of the hearing because people on the panel were not at all in agreement that MBK should prevail on any count. Yet the written decision received by the victim indicates that the panel voted unanimously on each individual charge except one, where they ruled 3-2 in favor of MBK. This irregularity warrants investigation.

Relatedly, it is peculiar that this SMB member said that each panel member was required to individually sign the final decision once it was reduced to writing by the Chair of the SMB, yet the victim received a copy of the decision without any individual signatures from panel members. The victim's copy was signed only by the Chair of the SMB. OCR should obtain the original signed decision to determine whether the document provided to the victim is, in fact, the actual decision that was rendered by the panel.

## OVERACHING OBSERVATIONS ABOUT THE PREPONDERANCE OF EVIDENCE STANDARD

It should also be emphasized at the outset that MBK lied repeatedly about the incidents in question, and that the victim, by contrast, provided only indisputably credible evidence. Indeed, the SMB in its formal decision specifically found that the victim's credibility was "very compelling and believable", and at least one police official said, on the record, that she was the most credible victim he had ever interviewed. No similar finding was made regarding the testimony and statements of the accused student. To the contrary, the SMB in its decision described MBK as "disrespectful", and "offensive",

and further suggested he get counseling. This is not surprising given that MBK blatantly lied to investigators, police and the SMB about important facts.  Specifics in this regard are set forth in more detail below.

Where a board finds a victim's credibility to be "very compelling and believable" and the accused student has made demonstrably false and numerous contradictory statements on materially relevant and important issues, the preponderance standard demands a finding in favor of the "very compelling and believable" student.  This issue will be addressed further herein, however, it bears noting that UVA has a history of refusing to apply the preponderance standard, and applying a much stricter "clear and convincing" evidence standard, instead.  Only recently was UVA compelled by OCR to adopt the lesser standard.  While UVA policy now provides that the SMB was obligated to apply the preponderance standard in this case, even a casual observer can appreciate that the preponderance standard has no value if it can be applied so as to favor an accused student who makes repeated false statements about material facts, in a proceeding where the testimony of the victim is determined to be "very compelling and believable".  Put another way, despite UVA's apparent adoption of a preponderance standard, the SMB clearly applied a much stricter standard because no rational view of the evidence could have justified a finding in favor of a student whose denials of responsibility were demonstrably not credible.

That the SMB applied an unlawfully high burden of proof is corroborated by the statements of an SMB member with whom the victim's parents spoke after the SMB decision was rendered.  In a conversation on June 12, 2012, this member stated that the SMB found in favor of the accused student because the board could not say, "without a doubt", that he was not responsible for any of the charged offenses.  When asked what standard was applied to assess the evidence, this panel member never once used the word "preponderance".

On this point it is worth noting that when UVA agreed to change its policy and adopt the preponderance standard, it simultaneously changed its policy to require that decisions be unanimous.  Under UVA's previous "clear and convincing evidence" standard, decisions required only a majority of panel members to agree.  This new unanimity policy is inequitable because it requires victims to convince five panel members that a violation occurred, while the accused student need persuade only a single member to vote in his favor in order to prevent a ruling against him.

This case raises critically important issues related to a fair and proper application of the preponderance standard.  If the decision here is allowed to stand and an investigation is not undertaken to address the issues presented herein, UVA, and indeed, any school, could easily violate Title IX with impunity by adopting the preponderance standard in name only, and rendering decisions that, in fact, apply a stricter standard that disproportionately disfavors highly credible victims to the unfair benefit of non-credible denials by demonstrably guilty offenders.

This complaint also seeks review of the myriad ways UVA's process violated Title IX's "prompt and equitable" mandate including, significantly, the disturbing failure of UVA's forensic nurse to ascertain from the victim compelling evidence establishing that the victim had been incapacitated by "rape drugs". Despite that two certified experts in forensic sexual assault examinations attested to the fact that the victim's symptoms were classic signs of drug-induced incapacitation, and that it is mandatory for a forensic nurse to record such symptoms during a rape exam, UVA's nurse failed to make any notes or indicate in any manner whatsoever in her report that the victim described symptoms consistent with drug-induced incapacitation. To the contrary, she put nothing in her report about the victim's description of such symptoms and intermittent lucidity and unconsciousness, feeling that her mind was unconnected to her body, sweating, nausea, dizziness and many more, etc., Furthermore and Inexplicably, this same nurse failed to note or record serious physical damage in the victim's vagina, including "jagged" tearing and other indicators of vaginal trauma. In fact, shockingly, this nurse applied dye to the victim's vagina in order to enhance the visibility of the victim's injuries in internal forensic photographs, yet she never produced those photographs and has claimed to the victim's family, since that time, that no photos were taken of the victim's injuries. This absurd statement is contradicted by the fact that this nurse *did* produce a handful of photographs of the external genitalia, which photos show no dye and bear no relevance to the issues in the case.

This disturbing behavior of UVA's nurse is exacerbated by the related intentional decision of UVA officials to withhold from the SMB evidence of the victim's drug-induced incapacitation by censoring the victim's police statement so as to exclude her description of earmark symptomatology. These and other intentional efforts by UVA officials, set forth in more detail below, individually and collectively undermined the integrity of the investigative and hearing processes, inhibited the SMB's ability to conduct an equitable hearing and render an equitable decision, and violated the victim's rights under Title IX and Title IV.

PRIOR PROCEEDINGS

The decision at issue was rendered March 30, 2012. The SMB considered multiple allegations of sexual misconduct against accused student MBK. After the SMB rendered its decision in favor of MBK on all counts, the victim filed an appeal. The victim raised multiple issues with the appeals board, including concerns about the way the process violated Title IX. The victim hoped to avoid filing this complaint by affording UVA an opportunity to bring its process into compliance with Title IX, but her appeal was denied on June 1, 2012. Here it should be noted that under UVA's rules, the appeal decision should have been rendered no later than May 7, 2012. This violation of Title IX's promptness mandate is addressed further herein.

Significantly, the appeals board declined even to consider the victim's arguments about violations of Title IX on the grounds that any such violations were beyond their jurisdiction. Because the appeals board refused to consider Title IX violations, this complaint also seeks review of whether UVA's appeal procedures violate Title IX by

virtue of the fact that they nowhere provide an opportunity for a victim to address violations of federal law.  Needless to say, because Title IX requires that victims be afforded "appeal opportunities", it makes sense that those opportunities would include the right to address violations of Title IX.  If victims have a right of appeal under Title IX, but the process forbids an appellate panel to address violations of Title IX, then Title IX itself effectively, ironically, enables schools to facilitate Title IX violations because, as happened here, the appeal can delay a final resolution thus interfere with a victim's right to "promptness".  In turn, the process causes a victim to continue experiencing a hostile educational environment and unequal access to education.

To the extent a victim can seek redress at OCR before an appeal is filed and/or decided, the risk of unfair delay may be inconsequential.  But if a victim is obligated to exhaust her appeal remedies internally, before turning to OCR for relief, not only is her ability to seek redress for violations of Title IX significantly impaired, but also, the authority of OCR to ensure compliance is seriously undermined because gratuitous appellate proceedings afford the victim no hope of institutional remedial action, while a school "runs out the clock" on the possibility of external oversight.

THE BASIC UNDERLYING FACTS

UVA charged MBK with multiple counts of "Non-Consensual Sexual Contact" for sexual offenses committed against the victim over a course of several hours starting near midnight on December 1 and continuing into the early morning hours of December 2, 2011.  On the night in question, the victim initially came into contact with MBK at a debate club meeting at Jefferson Hall, on UVA's campus.  MBK arrived carrying two oversized bottles of beer (they were covered by brown paper) and situated himself directly behind the victim. Several witnesses stated the victim was drinking her own bottle of beer, a fact that MBK incredulously insisted he did not notice.  MBK then maneuvered himself so that he was sitting next to the victim and at certain points he touched the victim's thigh and breast, without consent.  He also repeatedly handed the victim one of the two bottles to drink from.

Soon thereafter, the victim became substantially incapacitated.  MBK then took the victim to his apartment, raped her, pulled her hair in an effort to penetrate her mouth, and ejaculated on her chest and hair.  When the victim regained consciousness, she noticed that she was naked, with her bra hanging from her body.  She had only sporadic memory of the incident and could not even recall whether MBK penetrated her vagina with his penis, though she experienced vaginal pain, bleeding, (she had been a virgin) and irritation including bacterial and yeast infections, followed by a serious bladder infection within a week.  She also experienced classic symptoms of drug-induced incapacitation and provided these details to a UVA forensic nurse as well as to law enforcement officials in a recorded statement.  As described in more detail below, substantial evidence shows that MBK secretly drugged the victim when he shared one of his beers with her at Jefferson Hall.

The victim reported the incident promptly to the Dean of Students on December 5, 2011 and sought medical care, initially, at Martha Jefferson Hospital the evening of December 5, 2011.  A genital examination at the hospital was retraumatizing to the victim and triggered flashback memories of certain facts. As is typical of drug-facilitated sexual violence, the victim began remembering additional information about the incident within a few days.  After speaking to witnesses who were present at Jefferson Hall in the hours leading up to the rape, the victim recalled enough information to file a complaint with the Charlottesville Police Department (CPD) on December 8, 2011. After a lengthy interview with the CPD, an advocate from the Commonwealth Attorney's office arranged for the victim to have a forensic exam specifically with a UVA-employed SANE (Sexual Assault Nurse Examiner) nurse named Kathryn Laughon. The victim was examined by Laughon, who is also employed as a professor in the UVA School of Nursing and coincidentally serves as Chair of the SMB Advisory Committee, at a UVA-owned medical facility. (Conflict of interest concerns are addressed further herein).  UVA officials did not schedule a hearing on the charges against MBK until March 30, 2012, and a final determination was not reached until after the victim's appeal was denied on June 1, 2012, six months after the incident.

The SMB was obligated to assess the evidence under a mere "preponderance of evidence" standard as this is required by UVA policy and mandatory under Title IX.  A "preponderance of evidence" is defined as that which is "sufficient to persuade the finder of fact that the proposition is more likely true than not". See, e.g., In re Winship, 397 U.S. 358, 371, 90 S.Ct. 1068, 1076, 25 L.Ed.2d 368 (1970).  In a matter such as this where there are only two witnesses to the event in controversy, the preponderance standard simply means that when those two witnesses make conflicting statements, the ruling must favor the witness who is slightly more credible than the other.

It should be noted here that although UVA charged MBK with violations of UVA's sexual misconduct policy based on the idea that an initial incident involving nonconsensual touching of the victim's breast occurred at Jefferson Hall around midnight, and the second set of violations occurred at MBK's apartment a couple of hours later, a correct framing of the incidents would have charged MBK with one incident at Jefferson Hall and at least four distinct violations at MBK's apartment because the charging panel found sufficient evidence to proceed against MBK on the following acts:  (1) penile penetration, (2) digital penetration (3) forced oral/penile contact (4) nonconsensual ejaculation.

RELEVANT CODE PROVISIONS

"Nonconsensual Sexual Contact" is defined in UVA's code of conduct as "Sexual Contact that occurs without Effective Consent".  "Effective Consent" is defined, in relevant part, as "words or actions that show a knowing and voluntary agreement to engage in mutually agreed-upon sexual activity. Effective Consent cannot be gained by force, by ignoring or acting in spite of the objections of another, or by taking advantage of the Incapacitation of another, where the accused student knows or reasonably should have known of such Incapacitation   ."  "Incapacitation" is then defined as "   the

physical and/or mental inability to make informed rational judgments.  States of Incapacitation include without limitation, sleep, blackouts, and flashbacks.  Where alcohol [or other drug] is involved, one does not have to be intoxicated or drunk to be considered Incapacitated.  Rather, Incapacitation is determined by how the alcohol consumed impacts a person's decision-making capacity, awareness of consequences, and ability to make informed judgments.  The question is whether the accused student knew, or a sober, reasonable person in the position of the accused student should have know, that the complainant was incapacitated.  Because Incapacitation may be difficult to discern, students are strongly encouraged to err on the side of caution; i.e., when in doubt, assume that another person is incapacitated and therefore unable to give Effective Consent.  Being intoxicated or drunk is never a defense to a complaint of Sexual Misconduct under this Policy."

During the investigation, and at the hearing, MBK admitted committing three of the four offenses that occurred at his apartment, and disputed only that the victim lacked capacity to give "effective consent".   MBK also conceded that the victim repeatedly told him "no" to all sexual contact and defended himself on the incidents that occurred at the apartment by suggesting that despite the victim's repeated protestations, she had changed her mind and acquiesced to his persistence.  MBK admitted that he never had actual permission to engage in any sexual activity with the victim and stated only that he assumed he had permission to act because he believed the victim had capacity to give effective consent.  On this point it should be emphasized that the victim described being completely unconscious at points, and experiencing only sporadic lucidity.  Because she was found to be "very credible", her statements in this regard were clearly accepted as true, which means MBK's claims that he did not realize the victim was incapacitated cannot be credited.  Put another way, if the victim's statements regarding her incapacitation are to be believed, as the SMB determined was the case, MBK's implausible claim that he did not realize the victim was incapacitated must be rejected, and under a preponderance standard, he cannot prevail.

As for the breast touching incident at Jefferson Hall, which occurred before the victim became incapacitated, MBK's defense consisted of denying that he touched the victim's breast and stating to the SMB that there were no witnesses to corroborate the victim. That he chose to defend himself by stating that the victim should be disbelieved because she had no corroborative evidence is telling not only in terms of revealing MBK's consciousness of guilt, but also because of the disrespectful suggestion that the word of a victim, alone, is somehow inadequate to sustain a sexual assault charge.

Moreover, MBK admitted to repeatedly touching the victim's thigh without her permission, no doubt because other eyewitnesses at Jefferson Hall reported seeing him do this.  He also acknowledged that the victim repeatedly told him to stop touching her, yet he persisted in disrespecting her wishes. Even on this relatively minor offense, MBK clearly lied. In his initial statement to investigators he claimed to have stopped touching the victim's thigh after she told him twice to stop.  Witnesses told investigators he continued touching the victim throughout the evening.  When confronted about this at the SMB hearing, MBK brushed off his false statement as inconsequential by saying, "I

must have said two instead of three", effectively admitting not only that he lied, but also that he repeatedly refused to honor the victim's explicit expressions of non-consent to his sexual advances.

As set forth in more detail below, MBK repeatedly lied and demonstrated such profoundly poor credibility in general, none of his denials of responsibility on any of the charges can be credited, much less deemed more believable than the highly credible statements and testimony of the victim.

THE SANE NURSE'S FAILURE TO ACT EQUITABLY

UVA employee Kathryn Laughon, a certified SANE nurse, failed to comply with professional standards applicable to nurses who are SANE certified to conduct such examinations by the International Association of Forensic Nurses. Her care and handling of the matter was profoundly sub-standard and inequitable under Title IX which mandates that investigations be "adequate, reliable and impartial". Nurse Laughon's forensic investigation was inadequate, unreliable and not impartial in at least three significant ways:

1.  Nurse Laughon failed to record **_any_** information about the victim's symptomatology associated with drug-induced incapacitation. Even more shocking, in a meeting with the victim and her mother after the forensic examination, Laughon went out of her way to advise them to "focus on the alcohol and avoid talking about drugging". She even recommended that they contact a toxicologist who could opine and give expert testimony on the amount of alcohol consumed by the victim and its possible effects on her capacity to consent. The victim's family took this advice at face value and in earnest and reached out to experts in alcohol-related intoxication and incapacitation even though the victim and her family learned later, from experts, that she did not drink enough on the night in question to cause intermittent lack of consciousness. Unlike Nurse Laughon, the victim and her parents had no experience with or knowledge about rape drugs, thus had no way of knowing that the victim's symptoms were classic signs of drug-induced incapacitation.

2.  Nurse Laughon changed the initial findings she included in her first report where she noted there were "Tears" to the "Posterior Fourchette of the External Genitalia", a typical finding in sexual assault cases. Her subsequent report stated that there were "no injuries noted". This second report was written specifically for the SMB. In yet another inconsistent report submitted to police, Nurse Laughon wrote that the victim suffered "minor injuries'.

3.  Nurse Laughon destroyed and/or failed to produce photographs of the victim's vaginal injuries to the SMB, the police or the family. In fact, when asked, in writing, for the photographs, Laughon failed to provide a response to the family as to whether the photographs even exist. Yet the victim, who went to the examination with her mother, reported being catheterized and having dye applied

inside her body in order to facilitate the photographing of her injuries. Nurse Laughon specifically explained to the victim that the catheter was necessary to allow photographs to be taken, and that the dye would make the injuries visible in the photographs. Dozens of photos were taken, which is standard for a SANE examination in a case such as this, yet only six (6) were produced and among those, **not a single photograph** depicts the interior of the victim's vagina. Even more shocking, none of the photographs depicts dye or the catheter that was in place while internal photos were being taken for the purpose of recording the victim's injuries. The absence of such photographs is inexplicable, especially given that in one of her reports, Nurse Laughon described all the procedures she undertook to examine the victim and admitted in this report to taking numerous photographs of the interior of the victim's vagina. Yet not a single internal vaginal photo, or even a photo depicting the use of dye, has been produced.

The use of a catheter and dye to record vaginal injuries is consistent with national SANE protocol, and, as two experts have attested (their affidavits were submitted to UVA for consideration) internal vaginal photographs absolutely ***would have been taken*** in a case such as this. Inexplicably, however, the photos have disappeared, without explanation, in a case where vaginal injuries were critically important to a fair assessment of the facts because MBK claimed not to have committed an act of penile/vaginal penetration, and testified that he only penetrated the victim with one finger. Penetration by a single finger would not have produced multiple tears and "jagged" tear injuries.

An independent expert hired by the victim's family subsequently examined the victim and noted that the hymen was damaged to a point where it was essentially completely gone, (The victim had been a virgin prior to the incident) and that the injuries included "jagged" tears and "clefts". That a UVA-employed nurse somehow "misplaced" critically important photographs depicting these injuries is very troubling and raises questions of significant enough magnitude, materials are being prepared for submission to appropriate regulatory and licensing boards so that Nurse Laughon's handling of this matter can be reviewed for basic competency. Likewise, information regarding Nurse Laughon's handling of this matter is being prepared for dissemination to other appropriate officials because such sub-standard care may affect the integrity of other civil and criminal legal controversies in which Nurse Laughon has been involved. This sinister behavior has been addressed with Michael Strine, the CEO of the Hospital, who at first dismissed the matter, but when confronted with the documentation said he would review it, only to return with a totally inadequate response and offering no rational explanation.

Curiously, Nurse Laughon and UVA Health Systems have not submitted a bill for services to the Virginia Criminal Injuries Compensation Fund (CICF), which refunds all expenses incurred in forensic examinations and aftercare for victims of sexual assault. That no request was submitted for compensation suggests that UVA may be intentionally insulating itself from oversight by refusing compensation as a way of avoiding compliance with national standards for the care of rape victims. According to

the CIFC, UVA Health Systems has not filed a single claim for reimbursement in over a year, which is highly unusual as this is the only SANE program in Albemarle County, where UVA is situated.

Interestingly, Nurse Laughon was recently quoted in a local news journal saying that she is the *only* point of contact for student victims and that she treated 38 student victims between 2008-2010. Despite these data, not a single criminal sexual assault case involving UVA students on students has been filed in Charlottesville in more than 10 years (excluding the self confessed rapist in the Liz Seccuro case from the 1980s which was much publicized in the press). It also appears that there have been no student expulsions for rape/sexual assault at UVA in more than a decade.

CONFLICTS OF INTEREST

It bears stating the obvious that having a UVA employee, who is also Chair of the SMB Advisory Committee, serve as the forensic nurse examiner in this case raises significant conflict of interest problems and substantial concerns about the impartiality of the investigation under Title IX. Experts in forensic nursing have confirmed to the victim's family that when any potential conflicts of interest are present, SANE policies require a follow-up peer review process to oversee the integrity of the exam.  Yet no peer review was conducted to assess Nurse Laughon's work in this case. By way of contrast, the expert in alcohol intoxication that Laughon recommended be contacted by the victim's family declined the victim's request on the grounds that he had a conflict of interest because of his academic relationship with UVA.

Even if employment status, alone, were not enough to undermine impartiality, it is inconsonant with Title IX's requirement that investigations be "adequate and reliable" that a forensic nurse with such seemingly strong credentials as a forensic sexual assault nurse then failed to comply with applicable national standards for SANE nurses, failed to record and/or maintain critically important evidence of vaginal injuries and completely failed to make any mention of the victim's symptoms that constituted earmark evidence of drug-induced incapacitation.   OCR should open an investigation to determine whether Nurse Laughon's strong ties to UVA rendered her sub-standard handling of this matter inadequate and unreliable under Title IX.

OTHER CONCERNS ABOUT CONFLICTS OF INTEREST

In addition to Nurse Laughon being employed by UVA, it is significant and troubling that Laughon's husband, Claude Worrell, is the Deputy Commonwealth Attorney in Charlottesville. The Commonwealth Attorney, Dave Chapman is an alumnus of UVA and UVA Law School.  Many of these individuals are and/or have been affiliated with UVA not only as Alumni but also as paid lecturers at the Law School. Even the Chief of Police for Charlottesville, Timothy Longo, has an apparent conflict of interest given that his wife and daughter are employed by UVA Health Systems. Chief Longo himself has lectured at the Law School and at the Darden Business School.

OCR and/or the Department of Justice should open an investigation to explore these myriad conflicts of interest and determine whether these relationships interfere with Title IX's equity mandate, and/or other rights under federal law.

## OVERARCHING OBSERVATIONS ABOUT CREDIBILITY, EQUITY AND UNLAWFUL APPLICATION OF THE PREPONDERANCE OF EVIDENCE STANDARD

The victim has far superior credibility, as a matter of law, compared to MBK because she was sworn to tell the truth pursuant to the UVA honor code, while MBK was not made to take a similar oath before testifying in front of the SMB.

Moreover, the victim is entitled to prevail under a preponderance standard, as a matter of law, because she was found to be "very credible and compelling' while MBK made numerous false and self-serving statements that greatly undermine his credibility.

1. The SMB determined that MBK was not responsible because MBK testified that he did not perceive the victim as being incapable of giving "effective consent" at the time of the incidents in question.  In fact, testimony and statements provided by the victim overwhelmingly demonstrated that the victim was substantially incapacitated, and the SMB not only credited this testimony but found the victim to be "very" credible.  If a "very" credible victim describes substantial incapacitation to the point where she had periods of total lack of consciousness, MBK's claims that he did not notice her diminished capacity must be rejected as per se implausible because both things cannot be true.  Moreover, MBK all but conceded that he knew the victim was incapacitated at the time of his sexual misconduct when he was asked by a police detective about his awareness of the victim's capacity.  Only days after the incident, MBK was interviewed at the Charlottesville police station and was asked whether he noticed that the victim was intoxicated, Not knowing at the time what toxicology tests may have been done, MBK's response was, "I'm not going to answer that".  At the hearing itself, months later, after MBK had obtained counsel and after MBK was told that no toxicology tests had been conducted, MBK told panel members the victim, "didn't show any signs of being intoxicated".  Shockingly, the portion of MBK's police interview where he refused to answer the very same question was excluded from consideration at the hearing.

2. MBK told investigators that he brought only **one oversized beer** with him to Jefferson Hall on the night in question, but numerous witnesses contradicted this claim and told investigators that MBK brought **two oversized beers** to Jefferson Hall.  MBK then changed his statement and accused investigators of putting erroneous information in the report where they claimed he told them he brought only one beer.  Given that investigators were keenly aware that alcohol and incapacitation were key aspects of their investigation, it makes no sense to credit MBK's claim that investigators made such a serious mistake.  A far more rational explanation of this important disparity is that MBK knew his claim that he brought only one beer would not be believed because too many witnesses confirmed the

true number of beers in his possession. That MBK would accuse an investigator of misreporting his statements is, itself, reason to discredit MBK on all claims given that investigators apparently got everything else correct. MBK compounded this lie with another by claiming that he "always" brought a second bottle of beer to give to his friend, Chris Jones, who was a member of the Debate Society. The President of the Debate Society checked the attendance roles and confirmed that Chris Jones had not attended any meetings that entire semester. Furthermore, MBK's attempt to soft-peddle his role in facilitating the dissemination of alcohol to a victim is strong evidence of his consciousness of guilt not only because a man legitimately unconcerned about his actions would have no reason to lie about how many beers he had with him during a time period when a rape victim was becoming incapacitated, but also because his lie lends substantial credibility to the victim's claim that he put rape drugs in one of his beers and had her drink from that bottle, while he drank from the other. Because the victim recalled seeing MBK drink from one of the bottles he brought to Jefferson Hall, if it were true that he brought only a single beer with him, it would have been reasonable to expect MBK to become affected by the rape drugs, too. It can reasonably be inferred that MBK knew he would undermine the victim's claim that he drugged her *only* if he brought a single beer to Jefferson Hall.

3. MBK lied *again* about the beers when he claimed that he traded one of his oversized beers for two smaller beers that he said a witness named Lauren Gilroy brought with her, in a six-pack, to Jefferson Hall. Ms. Gilroy told the SMB she was absolutely certain that she did not bring a six-pack but rather, brought two oversized beers. She told UVA, and provided an affidavit to the SMB and again to the appeal panel, stating that she has bank statements and witnesses to corroborate that she purchased two oversized beers prior to attending the meeting at Jefferson Hall on the night in question. Yet again the SMB, in their Decision Letter, accept MBK's assertion that Ms. Gilroy's statement was inaccurate, even though they had no reason to believe that and had every reason to doubt the accused as he had already alleged their own investigators of inaccuracies. That MBK lied *repeatedly* about his handling of beer bottles on the night in question is telling as it not only establishes his lack of credibility in general but raises further suspicion about his motives for lying about who brought what bottles to the meeting. At a minimum it can be inferred that by falsely claiming he traded one of his oversized beers for two of Ms. Gilroy's smaller beers from her six-pack, MBK hoped to create a narrative that excused him from responsibility for maintaining control over the two oversized beers he brought to the meeting. If it were true that he gave one of the two beers to Ms. Gilroy, he could reasonably claim to have had no control over that bottle, while simultaneously claiming that he shared the other bottle with the victim. As he suffered no ill effects while the victim became incapacitated, and nobody else suffered ill effects from the bottle he (falsely) claimed to have given to Ms. Gilroy, he could credibly claim to have produce unassailable proof that he did not put drugs in the beers he brought to the meeting. That his statement about trading beers with Ms. Gilroy has been unequivocally established as a false statement,

he cannot make such a claim.  More importantly, because this lie has been exposed, his credibility must be seen in an even more suspicious light because while it is beyond dispute that he did not trade a large beer for two smaller ones, (and it would make no sense to trade a large beer for a large beer) he stood before the SMB as a student who lied repeatedly about beer bottles, over which he had exclusive control, in a case where he is the only individual who had a motive to add drugs to one of those bottles for the purpose of facilitating his plan to rape the victim after the drugs took effect, and she became incapacitated.  MBK lied so many times about the sizes and numbers of beer bottles he brought to, or exchanged with others, at Jefferson Hall, it is impossible to rationally credit any statement he made about beer, or anything else.  Moreover, it can be inferred that he lied in an attempt to cover for the fact that he put drugs in one of the two oversized beer bottles he brought to Jefferson Hall, and planned to give the contaminated bottle to the victim in order to facilitate his sexual assault.  It remains unclear to this day what was in the particular bottle that MBK brought to Jefferson Hall, though the victim's symptoms are most consistent with GHB drugging. It is quite clear, however, that the source of the victim's incapacitation by drugging was the particular bottle of beer MBK brought with him, and insisted the victim drink from. On this issue it is interesting to note that the victim credibly testified she shared only one bottle with MBK, which would explain why MBK was able to drink from the other bottle without becoming ill. Yet MBK testified that he shared ***both*** beers with the victim and that she simply hadn't noticed that he was switching bottles without her knowledge. Again, this protest-too-much lie reveals itself as an obvious attempt by MBK to establish that he could not have drugged the victim because he, too, drank from the same bottle.  That MBK would put so much effort into lying repeatedly about a seemingly benign topic such as who drank from which beer bottles – belies a sinister reality.  Not only did MBK drug the victim, he was crafty enough to know he needed to construct a storyline that could raise doubts about whether he had total control over the tainted beer during the relevant time period.

4. In MBK's statement to police, he made the revealing claim that he "didn't put anything in [the victim's] drink", even though he made this statement at a time when he had not been asked about drugs or whether he had put anything in her drink.  Police mentioned early on in the interview that the victim believed she had been drugged, but at the time MBK offered up a remark about not putting anything in the victim's drink, no question had been put to him about "drugs" or whether he put something in the victim's drink.  This classic "tell-tale-heart" style admission undermined MBK's credibility because he made a gratuitous and defensive remark that had no relevancy whatsoever to the question being asked at the time.  MBK made a similarly damning statement when asked by police whether he ejaculated.  Instead of saying simply "yes", or "yes, on her stomach", he said "yes, but not inside her".  This comment obviously reveals the state of mind of a man who is revealing that ***at some point***, his penis ***was*** "inside" her.  Why else would a person answer a question about whether ejaculation occurred ***at all*** by describing the moment of ejaculation in ***relation to*** an act of

penile/vaginal penetration.  In other similar statements revealing his consciousness of guilt, MBK reported that after the incident he told friends not only that he "hooked up" with the victim, but also that "it was a mutual thing". By going out of his way to report that he told friends it was a "mutual thing" MBK reveals that the opposite is true as it makes no sense to talk about this aspect of a truly consensual sexual encounter unless MBK felt a need to protest too much about his "innocence" because he was, in fact, guilty.  When confronted with this at the hearing, MBK placed blame on his own witness, who he claimed made the statement to "help" him. In short, MBK accused his own witness of lying for him.

5. In his statement to police, during a period of MBK's interview when police were telling him about the possibility that toxicology tests would determine the victim's incapacitation, MBK repeatedly asked police for specific information about how much time passed between the incident and when the victim went to the hospital.  This demonstration of panicked and compulsive attention to the passage of time indicates significant concern on MBK's part not only that police would find out that he had drugged the victim, but also that rape drugs dissipate after a short period of time.

6. The segment of MBK's videotaped interview with the police where he anxiously inquires about how much time had passed before the toxicology tests were done was not shown to the SMB panel.  Nor was the panel shown the portion of the victim's police interview where she provided compelling and detailed descriptions of the symptoms she endured that proved her drug-induced incapacitation.  All the highlighted segments of the videotaped police interview of MBK and the audiotaped interview of the victim that were provided to the panel at the hearing were selected by Lauren Casteen, the Victim's Advisor, a UVA employee and an Associate Dean of Students. The victim had no input into determining which portions of each statement would be shown to the SMB.  She was initially advised that she could have such input, however, she was given virtually no opportunity to review either statement to make such a determination. In fact, when the victim and her mother tried to gain access to MBK's statement, they were told they needed to make an appointment with Advisor Casteen, and that Casteen was available on Friday March 16, 2012 at 2pm.  At 4pm, Casteen told the victim and her mother that she had to leave, which effectively prevented the victim from fully reviewing the statement.  This was the only chance the victim was given to review MBK's statement prior to the hearing.  The victim also made an appointment with Casteen to review her own two-hour audiotaped police interview, prior to the hearing, so she could determine which parts of her police statements should be admitted or excluded, but when she got to Casteen's office, she was told the CD was not working. When she tried again the following week, she was told this was not possible because Casteen was out of town at a three-day Conference, which she attended, coincidentally, with nurse Laughon and the Chair of the SMB. The victim tried again, upon Casteen's return, to review her statement and was forced to skip class to accommodate Casteen's schedule.  Again the victim was told that the CD was not working. This left little

time before the Pre-Hearing deadline of Friday March 23, 2012, by which the victim was required to submit her final decision about which portions of each statement she wanted included and excluded. The victim was left to rely on Advisor Casteen's discretion regarding which parts of her statements were played for the SMB. Shockingly, sections of the victim's statement where she described suffering a multitude of symptoms consistent with severe drug-induced incapacitation were excluded. This means that either Casteen intentionally de-selected certain portions so as to prevent the SMB from knowing the victim had been drugged, or she was embarrassingly incapable and/or untrained to recognize the symptoms of rape drugs and the importance of allowing the SMB to hear such critically relevant information.  By way of stark contrast, MBK was not made to rely on the discretion of an advisor to determine which evidence should be included or excluded as he had ample opportunity to see and hear the audio and videotaped statements, and to seek the advice of counsel when choosing which segments should be made available to the SMB during the hearing.  (Here it should be noted that nothing in the SMB procedures states that students can make determinations about evidence being excluded or included and that these decisions must be made at a Pre-Hearing meeting. Nonetheless, MBK arrived at the Pre-Hearing meeting demanding that certain evidence be excluded, including portions of the victim's statement to UVA investigators and her **entire** police audiotaped statement).

7. The victim was allowed full access to her and MBK's police statements only after the SMB rendered its decision, when the victim and her parents were preparing to file an appeal.  Even then, it took over six hours on the first attempt to listen and watch less than three hours of tape because there were constant technical problems.

8. During the Pre-Hearing meeting, the SMB Chair and the victim's own advisor, Casteen, allowed MBK to question the victim directly and aggressively, in violation of UVA rules.  Allowing such a confrontation was profoundly inequitable, especially on the facts here, given that the victim had been diagnosed with PTSD and was experiencing panic attacks and anxiety in the aftermath of the sexual assaults, up to and including during the hearing itself.  The SMB Chair knew of the victim's suffering and fragile condition yet allowed MBK to revictimize the victim during the Pre-Hearing in blatant violation of UVA rules that forbid such questioning.  Advisor Casteen responded to the victim's parents concerns in this regard by stating that having the accused confront the victim in such a manner would aid the victim in her recovery.

9. MBK lied about how the victim's clothing came to be removed. He told police that he took the victim's clothes off, yet at the hearing, he stated, "I distinctly recall each of us removing our own clothing". That MBK lied about this is not surprising given that the victim reported her clothes were in a state of disarray when she regained consciousness, with her bra only partly removed and hanging off her body. MBK could hardly expect the SMB to believe half-removed clothes would

be consistent with his false romanticized narrative of the incident, so he came up with a consensual-sounding explanation for how the victim's clothing came off. His patent lie on this important fact was self-serving and not remotely credible.

It is worth noting that there has been no allegation in this matter to even so much as suggest that the victim had a motive to harm MBK by falsely accusing him of committing acts of sexual misconduct.  MBK himself readily admitted to police on December 8, 2011 that the victim had no reason to falsely accuse him.  He later made an unsupported accusation that she lied because she regretted having consensual sex with him.  Asserting such a defense in a rape case is a common defense tactic, however, it makes no sense on the facts here.  Falsely accusing a person of a felony is, itself, a criminal offense, and lying to university officials about something as serious as rape can be punished by expulsion.  Yet the victim faced no criminal charges or even suspicion by law enforcement officials that she had filed a false police report or lied at any time during the investigation.  Likewise, university officials never once so much as implied that the victim falsely accused MBK of sexual misconduct, much less determined after the hearing that she committed a punishable offense.  Moreover, MBK had the right to file his own complaint against the victim, alleging that she falsely accused him of sexual misconduct, yet he not only never filed a complaint, he never even suggested that action be taken against the victim for putting him through criminal and university-based disciplinary procedures as a result of her lies.  His failure to take any action against the victim substantially undermines his credibility in general and on the only defense theory he asserted as to why she would accuse him of sexual misconduct if it were not true.  Where the only defense-proffered explanation for why the victim would falsely accuse MBK of serious misconduct lacks inherent credibility, the victim's credibility must predominate.  Put another way, without a plausible, much less credible explanation for why the victim would lie about being victimized by MBK, there can be no finding in MBK's favor under a preponderance standard.

If, as MBK claims, the victim "lied" because she "regretted" having consensual sexual contact with MBK, she would certainly have understood the strategic benefit of _**not**_ saying that she had little memory for the event or that she could not specifically recall penile-vaginal penetration.  A person who has truly consensual sex, then plans to lie about it the next morning, would know that it doesn't advance the lie to claim problems with memory about something as basic as whether there was penile penetration.  On this issue, it should also be noted that the victim became distressed during the internal examination of her genitalia, which is consistent with a victim experiencing retraumatization; a psychological response not noted during vaginal exams that follow regretted sex. Dole, P. J., ***Centering: reducing rape trauma syndrome anxiety during a gynecologic examination*** (Identifying symptoms of anxiety during a pelvic exam consistent with rape trauma syndrome and retraumatization during gynecologic examinations), 1996 J Psychosoc Nurs Ment Health Serv 34;10:32-7.  Despite this distress, the victim was firm with the nurse that she wanted to continue with the examination so that any and all evidence would be obtained via forensic testing, photographs, etc.

UVA'S LACK OF TRAINING AND INEQUITABLE EXCLUSION OF HIGHLY RELEVANT EVIDENCE REGARDING THE VICTIM'S DRUG-INDUCED INCAPACITATION

The victim's statements about failed memory, intermittent lucidity, and feeling as though her mind was not connected to her body, are inconsistent with the kinds of things liars say after "regretted sex".  Indeed, even the most inexperienced liar planning to falsely accuse an innocent person of sexual misconduct would know to allege offensive acts with clarity and to speak with conviction about each and every moment of an incident, rather than claiming to have vague memories and sporadic lucidity.

Reports of sporadic lucidity are commonly reported by victims who have been drugged. That the SMB had almost no knowledge of the victim's symptoms in this regard because Nurse Laughon declined to record them and because UVA officials censored the victim's police interviews to exclude the portions of her statements where she described symptoms of drugging, is disturbing.  Indeed, in an interview with the victim's mother on June 12, 2012, it was eminently clear that this member of the SMB has had no training whatsoever on rape drugs or how to recognize symptoms of drugging as the member told the victim's mother that a victim who was drugged would "have no memory" of the incident.  Clearly, as set forth in more detail below, this is a dangerously erroneous understanding of what happens to a victim who has been drugged. Memories can be retrieved, and lucidity during the crime is typically sporadic, as was exactly the experience described by the victim here.  UVA both failed to properly train SMB members to understand evidence of drugging, and failed to provide the SMB with sufficient information about the relevant facts in this regard by censoring the victim's police statements to exclude her descriptions of having suffered drug-induced incapacitation.  Moreover, UVA clearly lacks its own internal appreciation for the nature of this type of sexual violence because UVA's own forensic nurse failed to record *any* of the victim's symptoms, and the Advisor who censored and selected "relevant" portions of the victim's audiotaped police statement excluded all portions relating to the victim's description of drug-induced incapacitation.  This prevented the SMB from hearing the most important evidence in the case.  Exclusion of critically important evidence alongside inadequate training on the subject of rape drugs substantially undermined the SMB's ability to reach an equitable decision.  Even more disturbingly, the appeals panel, when addressing the victim's concerns that this important evidence had been excluded, wrote that the SMB had full access to the entire audiotaped police interview of the victim.  Yet, during the victim's mother's conversation with an SMB panel member on June 12, 2012, this individual said the SMB did not have access to full police interviews and that they were only allowed to review the portions that were selected and determined to be "relevant" by the parties, in the victim's case by Advisor Casteen.

That UVA policies allow and enable evidence of drug-induced incapacitation to be ignored and/or misconstrued is profoundly disturbing.  The U.S. Department of Health and Human Services has long provided schools with information on rape drugs and symptomatology, (see below) yet the SMB nowhere indicates that UVA officials

responsible for dealing with sexual misconduct have even a basic understanding of how to assess such information, and there is no evidence that the DHHS information has ever been provided to **any** responsible officials at UVA.  UVA's lack of understanding is evident in the fact that the SMB wrote in its decision that the victim was likely not incapacitated because the texts she sent before and after the incidents at MBK's apartment indicate lucidity and awareness.  They further point out that the victim made no spelling errors in her texts which is absurd given the well known fact that Blackberries have built-in automatic "spell check" functions.

Clearly, texts after the fact have little to do with a victim's condition **while she is incapacitated** by drugs, and for which a victim has little conscious awareness **because** of drugs, yet the SMB lacks even a rudimentary understanding of the significance of the victim's symptoms.  Nor does the SMB make note of the long lapse in all texting activity during exactly the time period when the victim described being in and out of consciousness while being victimized in MBK's apartment.

That the SMB took no steps to assess readily available information about drug-facilitated sexual violence despite a clear and credible report by the victim that she felt she had been drugged and had experienced many of the symptoms associated with the use of rape drugs.  Instead, the SMB dismissed the idea that rape drugs caused the victim's incapacitation after a search warrant was executed at MBK's apartment and no rape drugs were found.  That a search warrant produced no rape drugs is hardly proof that drugs were not used.  Indeed, it is widely known that some rape drugs can be made by mixing regular household ingredients such as paint thinner and drain cleaner.  Either the police officers in charge of this investigation, along with UVA officials, failed to ascertain whether MBK had rape drug components in his apartment  (which is curious given the prevalence of rape drugs and sexual violence on campuses nationwide) or a decision was intentionally made to look **only** for rape drugs in fully developed form.

Either way, courts regularly determine that rape drugs were used based simply on a victim's reported symptoms. See e.g., Yeobah v. State, 2008 Minn. App. LEXIS (holding that symptoms, alone, are sufficient to establish that a victim was rendered helpless by the effect of "rape drugs" even though there was no evidence the perpetrator put any substance in the victim's drink and even though the victim's toxicology tests were negative for any such substance.)  In the Yeobah case, as here, the only proof that drugs were used to incapacitate the victim was the victim's report that she suffered symptoms consistent with the experience of a person who was drugged, along with evidence that the perpetrator had access to the victim's drink at a time when rape drugs could have been administered surreptitiously.

Furthermore, though not required in a university proceeding where the rigorous evidentiary standards of the criminal justice system have little applicability, an expert provided the appeal panel with an affidavit attesting to the fact that the victim's symptoms were classic signs of drugging.

It should be noted that the sexual misconduct charges at issue do not require proof that MBK actually administered the intoxicating substance.  It is enough that the victim lacked capacity to give "Effective Consent" and that MBK knew or should have known that the victim lacked such capacity.  On this point, it bears repeating, as set forth above, that MBK not only had access to the victim's beverages during the relevant time period before the incident, he was also untruthful about whether he even had an opportunity and sufficient access to the victim's drink such that he could have been responsible for the drugging.

Initially, MBK claimed to UVA investigators that he brought only one beer with him.  He later changed his story and said he brought two.  That he lied initially about bringing only one oversized beer is indicative of his consciousness of guilt on the issue of whether he drugged the victim because if he truly had only a single beer, it would have lent credence to his self-serving claims that he could not have drugged the victim because he and the victim shared a beer and he suffered no ill effects.  If, however, MBK had *two* oversized beers, as turned out to be the truth (which MBK was forced to admit after multiple witnesses confirmed this fact), then he had an opportunity to put drugs in one of the two look-a-like bottles and to serve only the tainted bottle to the victim while drinking from the untainted bottle, himself.  In short, a seemingly benign false statement about beer bottles belies the sinister reality that MBK lied about having only brought only one beer with him to hide the fact that he had ample opportunity to put "rape drugs" in the beer he gave to the victim.

SMB and the appeal panel did nothing to assess MBK's lie about how many beers he brought with him, either in terms of his general lack of truthfulness or as an indication of his profound lack of credibility on the critical issues surrounding the victim's incapacitation.

OCR should consider this compelling evidence as ample proof that UVA's handling of this matter was not compliant with Title IX's equity mandate not only because MBK's credibility falls woefully short of sustaining the preponderance of evidence standard, especially when pitted against the substantially more weighty credibility of the victim, but also because of UVA's failure to investigate, train and even responsibly consider evidence of /the victim's drug-induced incapacity.

UVA's failure to give any weight to the clear evidence of drugging in this case is unconscionable, given the alignment of the victim's symptoms with the following well-known and highly publicized criteria, obtained from the federal government's website at http://www.womenshealth.gov/publications/our-publications/fact-sheet/date-rape-drugs.cfm#c:

*What are date rape drugs?*

*These are drugs that are sometimes used to assist a sexual assault. Sexual assault is any type of sexual activity that a person does not agree to. It can include touching that is not okay; putting something into the vagina; sexual intercourse; rape; and attempted rape. These drugs are powerful and dangerous. They can be slipped into your drink when you are not looking. The drugs often have no color, smell, or taste, so you can't*

tell if you are being drugged. The drugs can make you become weak and confused —
or even pass out — so that you are unable to refuse sex or defend yourself. If you are
drugged, you might not remember what happened while you were drugged. Date rape
drugs are used on both females and males.

The three most common date rape drugs are:

1. Rohypnol (roh-HIP-nol). Rohypnol is the trade name for flunitrazepam (FLOO-
neye-TRAZ-uh-pam). Abuse of two similar drugs appears to have replaced
Rohypnol abuse in some parts of the United States. These are: clonazepam
(marketed as Klonopin in the U.S.and Rivotril in Mexico) and alprazolam
(marketed as Xanax). Rohypnol is also known as:

- Circles
- Forget Pill
- LA Rochas
- Lunch Money
- Mexican Valium
- Mind Erasers
- Poor Man's Quaalude
- R-2
- Rib
- Roach
- Roach-2
- Roches
- Roofies
- Roopies
- Rope
- Rophies
- Ruffies
- Trip-and-Fall
- Whiteys

2. GHB, which is short for gamma hydroxybutyric (GAM-muh heye-DROX-ee-
BYOO-tur-ihk) acid. GHB is also known as:

- Bedtime Scoop
- Cherry Meth

- *Easy Lay*
- *Energy Drink*
- *G*
- *Gamma 10*
- *Georgia Home Boy*
- *G-Juice*
- *Gook*
- *Goop*
- *Great Hormones*
- *Grievous Bodily Harm (GBH)*
- *Liquid E*
- *Liquid Ecstasy*
- *Liquid X*
- *PM*
- *Salt Water*
- *Soap*
- *Somatomax*
- *Vita-G*

*3. Ketamine (KEET-uh-meen), also known as:*

- *Black Hole*
- *Bump*
- *Cat Valium*
- *Green*
- *Jet*
- *K*
- *K-Hole*
- *Kit Kat*
- *Psychedelic Heroin*
- *Purple*
- *Special K*

- *Super Acid*

*These drugs also are known as "club drugs" because they tend to be used at dance clubs, concerts, and "raves."*

*The term "date rape" is widely used. But most experts prefer the term "drug-facilitated sexual assault." These drugs also are used to help people commit other crimes, like robbery and physical assault. They are used on both men and women. The term "date rape" also can be misleading because the person who commits the crime might not be dating the victim. Rather, it could be an acquaintance or stranger.*

*What do the drugs look like?*

a. *Rohypnol comes as a pill that dissolves in liquids. Some are small, round, and white. Newer pills are oval and green-gray in color. When slipped into a drink, a dye in these new pills makes clear liquids turn bright blue and dark drinks turn cloudy. But this color change might be hard to see in a dark drink, like cola or dark beer, or in a dark room. Also, the pills with no dye are still available. The pills may be ground up into a powder.*

b. *GHB has a few forms: a liquid with no odor or color, white powder, and pill. It might give your drink a slightly salty taste. Mixing it with a sweet drink, such as fruit juice, can mask the salty taste.*

c. *Ketamine comes as a liquid and a white powder.*

*What effects do these drugs have on the body?*

*These drugs are very powerful. They can affect you very quickly and without your knowing. The length of time that the effects last varies. It depends on how much of the drug is taken and if the drug is mixed with other drugs or alcohol. Alcohol makes the drugs even stronger and can cause serious health problems — even death.*

*Rohypnol*

*The effects of Rohypnol can be felt within 30 minutes of being drugged and can last for several hours. If you are drugged, you might look and act like someone who is drunk. You might have trouble standing. Your speech might be slurred. Or you might pass out. Rohypnol can cause these problems:*

a. ¥ *Muscle relaxation or loss of muscle control*

b. ¥ *Difficulty with motor movements*

c. ¥ *Drunk feeling*

d. ¥ *Problems talking*

e. ¥ *Nausea*

f. ¥ *Can't remember what happened while drugged*

g. ¥ *Loss of consciousness (black out)*

h. ¥ *Confusion*

    i.  ¥ *Problems seeing*

    j.  ¥ *Dizziness*

    k.  ¥ *Sleepiness*

    l.  ¥ *Lower blood pressure*

    m. ¥ *Stomach problems*

    n.  ¥ *Death*

*GHB*

*GHB takes effect in about 15 minutes and can last 3 or 4 hours. It is very potent: A very small amount can have a big effect. So it's easy to overdose on GHB. Most GHB is made by people in home or street "labs." So, you don't know what's in it or how it will affect you. GHB can cause these problems:*

    a.  ¥ *Relaxation*

    b.  ¥ *Drowsiness*

    c.  ¥ *Dizziness*

    d.  ¥ *Nausea*

    e.  ¥ *Problems seeing*

    f.  ¥ *Loss of consciousness (black out)*

    g.  ¥ *Seizures*

    h.  ¥ *Can't remember what happened while drugged*

    i.  ¥ *Problems breathing*

    j.  ¥ *Tremors*

    k.  ¥ *Sweating*

    l.  ¥ *Vomiting*

    m. ¥ *Slow heart rate*

    n.  ¥ *Dream-like feeling*

    o.  ¥ *Coma*

    p.  ¥ *Death*

*Ketamine*

*Ketamine is very fast-acting. You might be aware of what is happening to you, but unable to move. It also causes memory problems. Later, you might not be able to remember what happened while you were drugged. Ketamine can cause these problems:*

    a.  ¥ *Distorted perceptions of sight and sound*

    b.  ¥ *Lost sense of time and identity*

    c.  ¥ *Out of body experiences*

d. ¥ *Dream-like feeling*

e. ¥ *Feeling out of control*

f. ¥ *Impaired motor function*

g. ¥ *Problems breathing*

h. ¥ *Convulsions*

i. ¥ *Vomiting*

j. ¥ *Memory problems*

k. ¥ *Numbness*

l. ¥ *Loss of coordination*

m. ¥ *Aggressive or violent behavior*

n. ¥ *Depression*

o. ¥ *High blood pressure*

p. ¥ *Slurred speech*

Even a quick review of the victim's description of the symptoms she experienced, as described in her audiotaped police statement, overwhelmingly supports the conclusion that she was drugged and incapacitated at the time of the incidents in question. In fact, she describes experiencing nearly every symptom associated with GHB intoxication, which is the rape drug most commonly made "at home" by perpetrators who combine common household products pursuant to recipes widely available on the internet. The victim stated she experienced similar symptoms during two previous encounters with MBK at debate society gatherings, where MBK had access to her drink and kissed her only after she became incapacitated. On both occasions the victim's friends removed her from the situation, recognizing that MBK was inappropriate and that the victim was not "herself". On the first occasion, MBK yelled at the victim's friend for extricating the victim from his grasp, even though MBK knew the victim was incapacitated. During the second similar encounter, MBK stated that he knew the victim was incapacitated yet he insisted that he wanted to take her to his room. This evidence amply demonstrates that MBK is a predatory sex offender who sought out the victim as a vulnerable and perhaps naïve young woman. His relentless aggression aimed at obtaining sexual access to the victim is made all the more abhorrent by the fact that he knew she was a virgin. Sex offenders who seek out virgins and vulnerable young women for victimization and conquest are among the most dangerous. Nobody affiliated with this case appears to understand the serious, arguably sociopathic motivations behind such offenders.

OCR should consider this evidence, alongside evidence of the victim's "compelling" credibility and MBK's lack of credibility, to assess whether the SMB unlawfully applied the preponderance standard to the inequitable disadvantage of the victim, in violation of Title IX.

While the SMB credited MBK's claim that he was unaware of the victim's incapacitation, the myriad reasons set forth above should suffice to resolve all credibility issues in the victim's favor, including disputes over whether a reasonable person would have known the victim was unable to give "Effective Consent". If the victim is to be believed, that she was in and out of consciousness and only sporadically lucid, then it is axiomatic that MBK "should have known" she lacked capacity to consent. His claim to the contrary deserves no weight given his profound lack of credibility on many key facts.

Put another way, MBK's claim that he was unaware of the victim's diminished ability to give "Effective Consent", at a minimum, cannot be credited at all, much less be given **more weight** than the victim's "very" credible and compelling testimony that she was in and out of consciousness.

## EVIDENCE OF PENILE/VAGINAL PENETRATION

MBK claimed there was no penile/vaginal penetration and that he only penetrated the victim with his finger. He claimed he resisted penetrating the victim with his penis because she had told him earlier that she did not want to have sex with him. Yet MBK nowhere explained what he was doing on top of the victim with his arms by her side. Clearly, this was not a moment when MBK was penetrating the victim with his fingers as his hands were by her sides. If, as could have been the case at least in theory, MBK was lying on top of the victim for sexual purposes but was not causing penile penetration of the vagina, he would have said so. That he said nothing at all about why he was on top of her speaks volumes and indicates his consciousness of guilt as he apparently could think of no credible, nonpenetrating reason to be in that position.

MBK's concession that he was aware the victim did not want to have "sex" should expose MBK to a mandatory finding against him **at least** on the general sexual misconduct charge because there is no evidence he had permission to penetrate the victim's vagina with **any** body part and if a person says they do not consent to sex, they are not saying they **do** consent to digital penetration. "Sex" generally refers to penetration by any means. MBK nowhere indicates that he had permission to penetrate the victim with his finger and he readily admits he was forbidden to engage in "sex". While some situations might be vague as when there is no clarity from a victim regarding her lack of consent in general, there can be no doubt **here** that the victim **did not** consent to any form of penetration and that she explicitly forbade penile penetration. In such circumstances, it cannot be denied that MBK had **no** consent to penetrate the victim's vagina with **any** part of his body. Thus, this claim has clearly been proved **at least** by a preponderance of evidence because MBK has conceded the point and as a matter of equity under Title IX the victim is entitled to a finding in her favor.

MBK denies committing an act of penile penetration, yet the victim was treated, medically, for pain and irritation in her vagina, and medical records confirm that, indeed, her vagina was red and irritated and her hymen had multiple injuries, including a jagged tear, cleft and tearing to the point of having almost no in tact hymen remaining after this incident. The victim also experienced vaginal discharge and a yeast infection and noted

that these things were not present before the incident. This was followed by a bladder infection, an even more serious medical malady not typically associated with digital penetration. For all these reasons, it is reasonable to infer, at least to a preponderance of evidence, that MBK committed penile penetration because it is clearly "more likely than not" that the position of MBK's body when the victim regained consciousness, combined with the medical findings that followed, are not consistent with penetration by a finger.

MORE INEQUITIES IN THE PROCESS

1. UVA did not move promptly.  OCR determined in its "Dear Colleague Letter" of April 2011 that schools should fully resolve sexual misconduct matters within 60 days and that schools may not await resolution by criminal justice officials before taking steps on campus to redress sexual misconduct.  Yet this matter languished for more than five months, without final resolution until June, 2012, in large part because UVA allowed the criminal justice system to conduct an investigation and determine whether prosecution was appropriate before it undertook its own steps to resolve the matter on campus.  While the victim did not file a formal complaint until late January, the "Dear Colleague Letter" states that a school has a responsibility to act promptly whether or not a formal complaint is filed based solely on whether the school has reasonable grounds to believe that an offense probably happened.  UVA was fully aware of this incident immediately after it occurred, as early as December 5, 2011 when the victim and her parents met with the Associate Dean of Students, Nicole Eramo, who is also Chair of the SMB, and not on December 7, 2011 as she misstated in her comments to the appeal panel. Yet, the appeal panel concluded that the 60-day period did not begin until January 20, 2012 when the victim filed a formal complaint.  Clearly, not only was this case handled in a non-prompt manner, but also, UVA, as a matter of policy, is violating Title IX by measuring the 60-day period incorrectly beginning not when it becomes aware that a violation of Title IX may have occurred, but rather, when an official complaint is filed.  OCR should open an investigation to determine whether Title IX's promptness mandate has been violated in this case, and/or is being violated by UVA as a matter of policy.

2. UVA officials interviewed the victim on January 23, 2012 and three weeks later interviewed MBK on February 14, 2012. UVA told the victim that there was an ongoing criminal investigation by the CPD and that MBK's attorney did not want him to be interviewed while there was an investigation going on. Yet the CPD report shows that a decision by the Commonwealth Attorney not to prosecute had already been made as early December 14, 2011.  This means UVA gave MBK three additional weeks to prepare a statement, with the assistance of private counsel, before his interview with UVA officials.  During the course of their investigation, UVA officials shared MBK's witness list with the victim to determine whether she knew any of them. She recognized one as a friend of hers and, incidentally, she was not interviewed even though they stated in their report as having interviewed her. Presumably, investigators did the same with

MBK.Allowing an accused student not only additional time but also the opportunity to have a criminal lawyer assist in the crafting of a written response submitted a week after the interview is profoundly inequitable as it enables one student to formulate a strategic narrative, thus undermining rather than elucidating the truth and putting the victim at an extreme disadvantage.  OCR should open an investigation on this point to determine whether allowing an accused student substantially more time to prepare for an interview, with the assistance of counsel, while the victim is interviewed long before the accused, without the assistance of counsel, violates Title IXs equity mandate, and whether a preferable policy would require the two primary witnesses to provide statements simultaneously, and with both students either not being allowed legal counsel, or ensuring that both have equal access to the assistance of independent and competent counsel during the statement preparation period.

3.  The victim informed UVA that she wanted a "No Contact" order on December 10, 2011. UVA issued a "Mutual" no contact order on December 14, 2011, requiring not only that MBK stay away from the victim but also that the victim stay away from MBK.  This is a direct violation of Title IX's equity mandate as it is inappropriate to restrain the freedom of any victim (under threat of sanction for violations of the order) where the victim has not even been **accused** of wrongdoing. This unfair treatment of victims is why the victim was reluctant to ask for a no contact order in the first place.  She was offended that her need for protection would subject her to the same restrictions as MBK, and she shared these concerns with a victim advocate after giving her statement to police.

4.  UVA relied on the victim's texts to examine her state of mind and other issues in the days after the incident took place, but UVA officials took no steps to ascertain access to MBK's phone or computer records so that his state of mind and communications could similarly be examined.  This violates Title IX's equity mandate as investigations must be "adequate reliable, and impartial", and it is exceedingly inadequate, unreliable and unfair to subject only one student to this investigational tactic.  On the unique facts here, this point cannot be overstated because MBK told UVA officials that he reported to "friends" not only that he had a sexual encounter with the victim but also that it was "consensual".  This protest-too-much disclosure should have been fully investigated not only by talking to those alleged "friends" but also through an examination of text messages.  This is a particularly serious concern in a case where, as here, a witness reported to UVA officials that MBK was "texting" to people at the time of the incidents in question. For example, Annelise Bederman gave a statement to the SMB wherein she describes texting with MBK while he was in Jefferson Hall, telling him that she forgot her water bottle and for him to take it in his safe keeping. This proves he was texting that night at the time in question, and UVA officials knew he had been texting during a critical time period. Yet UVA officials declined to ask him for access to his text files.   OCR should open an investigation to determine whether it violates Title IX's equity mandate, and the requirement that investigations be "adequate, reliable and impartial", to demand of a victim that

she produce her entire text files, while **not even asking** the accused student to produce the same type of evidence.

5.  UVA officials knew the victim reported bleeding from her vagina during and after the incident, and that MBK said in his police interview that there had been "no bleeding", interestingly, this evidence is yet another segment of MBK's videotaped police interview that was excluded from consideration at the SMB hearing.

6.  When police executed a search warrant at MBK's apartment, they noticed that his mattress pad was stained with a brown substance that appeared to be dry blood, yet UVA officials never requested any tests on the stain to determine whether it was, in fact, blood and whether the type matched the victim. This fast and inexpensive blood-type testing would have produced evidence far more probative than most of the investigative efforts expended by UVA, including, for example, UVA's request that the victim's parents retrieve the victim's text messages from her cell-phone.  OCR should open an investigation to determine whether UVA violated Title IX's equity mandate, and the requirement that investigations be "adequate, reliable and impartial", by failing to conduct a simple blood-type test on MBK's mattress pad.  Such a test, at a minimum, would have proved that MBK was lying about whether the victim bled during the incident in dispute, and would have corroborated, or not, the victim's statement that she experienced bleeding as a consequence of MBK's sexual misconduct.  Whether the victim bled was an essential fact in dispute.  UVA took no steps to confirm or disprove this critical piece of evidence even though officials knew the evidence existed and was available for testing. The Accused did not address this in his response to the appeal. However, UVA in its appeal decision wrote that the presence of the victim's blood could be explained by circumstances other than sexual misconduct and thus failure to test for same would not likely have been prejudicial.

7.  UVA forensic nurse, Kathryn Laughon, conducted a sexual assault examination of the victim, yet repeatedly and significantly failed to comply with standards of practice for certified rape-nurse examiners, including that she failed to conduct tests to determine the presence of semen; failed to conduct tests to confirm swelling and redness on the victim's scalp given that the victim reported that MBK pulled her hair hard when forcing her to lick his penis; failed to take (or produce) adequate photographs of the vaginal injuries to establish with objective medical clarity the nature and extent of the damage that she variously called "jagged tears" and a "cleft" and failed to record or assess the victim's drug-induced incapacity based on reported symptomatology and/or through blood or alcohol testing.  This UVA nurse then wrote a report inexplicably failing to mention the "Genitalia Tears" that she had noted in her initial clinical report even though she told the victim's mother there were "jagged tears" present.  In addition, although the victim's parents have repeatedly requested, from the nurse, a complete copy of her file, she has declined to respond or even to offer an explanation regarding the missing photographs. OCR should open an

investigation to determine whether UVA's forensic nurse's, who is also in charge of the forensic SANE program for the facility, handling of this case, and/or her policies in general, violate Title IX's equity mandate and related requirements that investigations be "adequate, reliable and impartial".

8. UVA investigators inequitably failed to include the contents of any of the police report in their investigation. They were informed by the CPD on February 22, 2012 that the police report was ready to be picked up. The investigators picked it up on February 27, 2012 but chose not to include it in their final report dated February 29, 2012.  Had UVA truly intended to conduct an equitable hearing it would have incorporated the entire police file in its report, and it would have submitted that report, as well as all unredacted audio and video statements, to the SMB for its consideration. Yet, as noted above, UVA officials significantly edited the statements that were given to police by MBK and the victim before allowing the SMB to hear and view them amounting to less than quarter of the time on the tapes.  At a minimum, censoring the statements of key witnesses inhibits the ability of a fact-finder to assess credibility because censored versions of statements lose the flow and context of a full narrative.  For example, MBK made statements that were particularly damning when he compulsively asked questions about the passage of time between when the incident ended and when the victim arrived at the hospital for toxicology testing.  His demeanor and urgency on this issue was not conveyed to the SMB because this portion of the tape was excluded from presentation.  OCR should open an investigation to determine whether UVA violated Title IX's equity mandate when it censored the statements of MBK and the victim before submitting them for consideration to the SMB.

9. UVA investigators failed to interview key witnesses who were present the night of the incident, and yet took the time to take statements from MBK's character witnesses, who did not know the victim and who were not present on the night in question. At the hearing, MBK admitted that one of his character witnesses had lied to help him. UVA investigators also omitted from their report, statements given to them by witnesses who would have rebutted MBK's favorable character witnesses with testimony that MBK was rumored to have been accused of drugging other female students at UVA. Investigators explained this omission in their report by saying, "we did not prepare summaries for students who lacked personal knowledge of the events relevant to the complaint".

10. UVA forbade the SMB to consider evidence that MBK presented an on- campus essay in the fall of 2011 in which he "fantasized" about committing sexually violent acts.  Investigators were given this essay by the victim during her interview but failed to account or mention it in their report without offering the victim an explanation. The victim re-submitted this essay to the Advisor to include it at the pre-Hearing which is when it was formally excluded. This essay was highly relevant not only because it reveals a sexually violent mindset, but also because the essay was presented by MBK during a Debate Society meeting in

front of many of the students who were witnesses to the circumstances surrounding the incidents at issue here, including the victim.  The victim stated that this essay caused her to feel repulsed by MBK, which is relevant to a fair assessment of the incident because it demonstrates that the victim would never have engaged in sex acts willingly with MBK had she not been drugged. OCR should open an investigation to determine whether exclusion of such important information violated Title IX's equity mandate.

11. UVA forbade the SMB to consider evidence that MBK had previously been accused of sexual misconduct and "drugging" another UVA student even though MBK falsely told police he had "never" been accused of sexual misconduct by any other young woman in the past.  A decision was made that information about this past offense could not be offered as evidence because it could not be corroborated, however, the claim was not disproved, either, and while UVA officials may have discretion to exclude certain information, they acted inequitably by nevertheless allowing that portion of MBK's police statement to be admitted where he states, falsely, that he had never before been accused of similar misconduct.  OCR should open an investigation to determine whether it violated Title IX's equity mandate to allow MBK to deny having been accused previously of sexual misconduct, while simultaneously forbidding evidence to the contrary.

12. At the start of the hearing on March 30, 2012, the Chair of the SMB swore in the victim on her honor and placed a gag order on her not to discuss the contents of the proceedings. The chair declined to swear in MBK and no similar gag order was placed on him. OCR should open an investigation to determine whether these actions violate Title IX's equity mandate.

13. UVA allowed MBK to review and comment on the admissibility of the victim's audio police statement without providing the victim with the same opportunity. On the one occasion when the victim was afforded an opportunity to listen to her tape, the Advisor told the victim and her mother the tape was not working.  She was never allowed to listen to her police statement or propose that certain parts of that interview be admitted, or not admitted, at the hearing.  OCR should open an investigation to determine whether allowing key witnesses disparate access to their statements to determine whether certain portions should be admissible at the hearing comports with Title IX's equity mandate.

14. UVA's inequitable handling of sexual assault complaints is reflected in a commonly issued notice to students, sent by email, wherein the Vice-President for Student Affairs, Patricia Lampkin, writes: *If you are intoxicated, your impaired judgment places you at a much greater risk for the following: injuries; sexual activity that is later regretted or does not include mutual consent; or a police citation. If you do plan to drink, set a limit on the number of drinks you'll have and stick to it. The first 600 students who register for the Foxfield Savvy Fox program (pledge not to drink at the races) receive a T-shirt and free sodas.* This warning is

clearly aimed at female students, and no warning is ever sent to male student admonishing them not to take advantage of intoxicated females, or even advising them that having sexual contact with an intoxicated individual may result in criminal prosecution and expulsion from the university, despite the fact they clearly state these warnings in their sexual misconduct policies.

15. UVA also violated the victim's rights under HIPAA (Health Information Portability and Accountability Act) by sharing protected medical information without permission or lawful authority.  This concern is being addressed separately in a complaint being prepared for review by appropriate federal officials, however, it is mentioned here and incorporated herein by reference because HIPAA violations are inherently inequitable under Title IX.

CONCLUSION

The victim respectfully requests that OCR open an investigation to determine whether any or all of the above-described events, polices and procedures constitute discrimination based on sex and/or violate Title IX and/or Title IV's mandate that complaints be redressed promptly, effectively and equitably.  The victim also respectfully requests that OCR investigate and/or refer this matter to the Department of Justice for investigation to address the myriad conflicts of interest and related concerns, and to determine whether the failure to provide "adequate, reliable and impartial" investigation, prosecution and redress violated the rights of the victim in this case, in particular, and/or the rights of victims of discrimination "based on sex", as a class, under Title IX, Title IV and/or other federal law or regulatory provision.

# DOCUMENT 2



UNITED STATES DEPARTMENT OF EDUCATION
OFFICE FOR CIVIL RIGHTS

400 MARYLAND AVENUE, SW
WASHINGTON, DC 20202-1475

REGION XI
NORTH CAROLINA
SOUTH CAROLINA
VIRGINIA
WASHINGTON, D C

July 27, 2012

Ms. Wendy Murphy
154 Stuart Street
Boston, Massachusetts 02116

Re:    OCR Complaint No. 11-12-2118

Dear Ms. Murphy:

This letter is to notify you of the decision about the complaint you filed on June 18, 2012, with
the District of Columbia Office of the U.S. Department of Education (Department), Office for
Civil Rights (OCR) against the University of Virginia (the University). You filed the complaint
on behalf of a female student (Student) at the University, alleging that the University
discriminated against the Student based on sex in connection with its Sexual Misconduct's
Board's handling of her complaint alleging sexual misconduct against another student.
Specifically, you allege that the University did not provide the Student with a prompt and
equitable resolution of her sexual misconduct complaint.

OCR is responsible for enforcing certain Federal civil rights statutes and regulations, including
Title IX of the Education Amendments of 1972 (Title IX) and its implementing regulation which
prohibit discrimination on the basis of sex, including sexual harassment and violence, in
programs and activities that receive Federal financial assistance from the Department. The
University receives Federal financial assistance from the Department and, therefore, is subject to
the provisions of Title IX and its implementing regulation.

Based on the information contained in your complaint, OCR is dismissing it and consolidating
the allegations in this complaint with OCR Case No.11-11-6001, an open compliance review
initiated by the OCR under Title IX. The purpose of this review is to assess whether the
University's policies and procedures and the University's implementation thereof ensure the
elimination of sexual harassment and sexual violence, appropriately respond to such harassment
and violence, and eliminate the hostile environment and its effects that result from such
harassment. The review will also examine whether the University responded immediately and
appropriately to complaints of sexual harassment and sexual violence. OCR has determined that
any remedy obtained through resolution of OCR Case No. 11-11-6001 would also resolve the
allegations, raised on behalf of the Student, contained in your new complaint. Therefore, we are
dismissing this complaint (11-12-2118) and consolidating the allegation raised in it with OCR
Complaint No. 11-11-6001, which is still pending.

*The Department of Education's mission is to promote student achievement and preparation for global competitiveness
by fostering educational excellence and ensuring equal access.*

*www.ed.gov*

Although we have not notified the District about your current complaint, please note that the District may not harass, coerce, intimidate, or discriminate against any individual because he or she has filed a complaint or participated in the complaint resolution process. If this happens, you may file another complaint alleging such treatment. Additionally, under the Freedom of Information Act, OCR may need to release this document and related correspondence and records upon request. If OCR receives such a request, we will seek to protect, to the extent provided by law, personal information that if released could constitute an unwarranted invasion of privacy.

We will contact you periodically to inform you of the status of the review. If you have any questions, please contact the lead attorney assigned to this complaint, Samantha Shofar, at 202-453-5929 or samantha.shofar@ed.gov.

Sincerely,

Rachel Glickman
Team Leader
District of Columbia Office
Office for Civil Rights
U.S. Department of Education

# DOCUMENT 3

S. 47—36

"(D) The grantee shall train all members of campus disciplinary boards to respond effectively to situations involving domestic violence, dating violence, sexual assault, or stalking."; and

(5) in subsection (e), by striking "there are" and all that follows through the period and inserting "there is authorized to be appropriated $12,000,000 for each of fiscal years 2014 through 2018.".

## SEC. 304. CAMPUS SEXUAL VIOLENCE, DOMESTIC VIOLENCE, DATING VIOLENCE, AND STALKING EDUCATION AND PREVENTION.

(a) IN GENERAL.—Section 485(f) of the Higher Education Act of 1965 (20 U.S.C. 1092(f)) is amended—

(1) in paragraph (1)—

(A) in subparagraph (C)(iii), by striking the period at the end and inserting ", when the victim of such crime elects or is unable to make such a report."; and

(B) in subparagraph (F)—

(i) in clause (i)(VIII), by striking "and" after the semicolon;

(ii) in clause (ii)—

(I) by striking "sexual orientation" and inserting " national origin, sexual orientation, gender identity,"; and

(II) by striking the period and inserting "; and"; and

(iii) by adding at the end the following:

"(iii) of domestic violence, dating violence, and stalking incidents that were reported to campus security authorities or local police agencies.";

(2) in paragraph (3), by inserting ", that withholds the names of victims as confidential," after "that is timely";

(3) in paragraph (6)(A)—

(A) by redesignating clauses (i), (ii), and (iii) as clauses (ii), (iii), and (iv), respectively;

(B) by inserting before clause (ii), as redesignated by subparagraph (A), the following:

"(i) The terms 'dating violence', 'domestic violence', and 'stalking' have the meaning given such terms in section 40002(a) of the Violence Against Women Act of 1994 (42 U.S.C. 13925(a))."; and

(C) by inserting after clause (iv), as redesignated by subparagraph (A), the following:

"(v) The term 'sexual assault' means an offense classified as a forcible or nonforcible sex offense under the uniform crime reporting system of the Federal Bureau of Investigation.";

(4) in paragraph (7)—

(A) by striking "paragraph (1)(F)" and inserting "clauses (i) and (ii) of paragraph (1)(F)"; and

(B) by inserting after "Hate Crime Statistics Act." the following: "For the offenses of domestic violence, dating violence, and stalking, such statistics shall be compiled in accordance with the definitions used in section 40002(a) of the Violence Against Women Act of 1994 (42 U.S.C. 13925(a)).";

(5) by striking paragraph (8) and inserting the following:

S. 47—37

"(8)(A) Each institution of higher education participating in any program under this title and title IV of the Economic Opportunity Act of 1964, other than a foreign institution of higher education, shall develop and distribute as part of the report described in paragraph (1) a statement of policy regarding—

"(i) such institution's programs to prevent domestic violence, dating violence, sexual assault, and stalking; and

"(ii) the procedures that such institution will follow once an incident of domestic violence, dating violence, sexual assault, or stalking has been reported, including a statement of the standard of evidence that will be used during any institutional conduct proceeding arising from such a report.

"(B) The policy described in subparagraph (A) shall address the following areas:

"(i) Education programs to promote the awareness of rape, acquaintance rape, domestic violence, dating violence, sexual assault, and stalking, which shall include—

"(I) primary prevention and awareness programs for all incoming students and new employees, which shall include—

"(aa) a statement that the institution of higher education prohibits the offenses of domestic violence, dating violence, sexual assault, and stalking;

"(bb) the definition of domestic violence, dating violence, sexual assault, and stalking in the applicable jurisdiction;

"(cc) the definition of consent, in reference to sexual activity, in the applicable jurisdiction;

"(dd) safe and positive options for bystander intervention that may be carried out by an individual to prevent harm or intervene when there is a risk of domestic violence, dating violence, sexual assault, or stalking against a person other than such individual;

"(ee) information on risk reduction to recognize warning signs of abusive behavior and how to avoid potential attacks; and

"(ff) the information described in clauses (ii) through (vii); and

"(II) ongoing prevention and awareness campaigns for students and faculty, including information described in items (aa) through (ff) of subclause (I).

"(ii) Possible sanctions or protective measures that such institution may impose following a final determination of an institutional disciplinary procedure regarding rape, acquaintance rape, domestic violence, dating violence, sexual assault, or stalking.

"(iii) Procedures victims should follow if a sex offense, domestic violence, dating violence, sexual assault, or stalking has occurred, including information in writing about—

"(I) the importance of preserving evidence as may be necessary to the proof of criminal domestic violence, dating violence, sexual assault, or stalking, or in obtaining a protection order;

"(II) to whom the alleged offense should be reported;

"(III) options regarding law enforcement and campus authorities, including notification of the victim's option to—

"(aa) notify proper law enforcement authorities, including on-campus and local police;

"(bb) be assisted by campus authorities in notifying law enforcement authorities if the victim so chooses; and

"(cc) decline to notify such authorities; and

"(IV) where applicable, the rights of victims and the institution's responsibilities regarding orders of protection, no contact orders, restraining orders, or similar lawful orders issued by a criminal, civil, or tribal court.

"(iv) Procedures for institutional disciplinary action in cases of alleged domestic violence, dating violence, sexual assault, or stalking, which shall include a clear statement that—

"(I) such proceedings shall—

"(aa) provide a prompt, fair, and impartial investigation and resolution; and

"(bb) be conducted by officials who receive annual training on the issues related to domestic violence, dating violence, sexual assault, and stalking and how to conduct an investigation and hearing process that protects the safety of victims and promotes accountability;

"(II) the accuser and the accused are entitled to the same opportunities to have others present during an institutional disciplinary proceeding, including the opportunity to be accompanied to any related meeting or proceeding by an advisor of their choice; and

"(III) both the accuser and the accused shall be simultaneously informed, in writing, of—

"(aa) the outcome of any institutional disciplinary proceeding that arises from an allegation of domestic violence, dating violence, sexual assault, or stalking;

"(bb) the institution's procedures for the accused and the victim to appeal the results of the institutional disciplinary proceeding;

"(cc) of any change to the results that occurs prior to the time that such results become final; and

"(dd) when such results become final.

"(v) Information about how the institution will protect the confidentiality of victims, including how publicly-available recordkeeping will be accomplished without the inclusion of identifying information about the victim, to the extent permissible by law.

"(vi) Written notification of students and employees about existing counseling, health, mental health, victim advocacy, legal assistance, and other services available for victims both on-campus and in the community.

"(vii) Written notification of victims about options for, and available assistance in, changing academic, living, transportation, and working situations, if so requested by the victim and if such accommodations are reasonably available, regardless of whether the victim chooses to report the crime to campus police or local law enforcement.

"(C) A student or employee who reports to an institution of higher education that the student or employee has been a victim of domestic violence, dating violence, sexual assault, or stalking, whether the offense occurred on or off campus, shall be provided

with a written explanation of the student or employee's rights and options, as described in clauses (ii) through (vii) of subparagraph (B).";

(6) in paragraph (9), by striking "The Secretary" and inserting "The Secretary, in consultation with the Attorney General of the United States,";

(7) by striking paragraph (16) and inserting the following:

"(16)(A) The Secretary shall seek the advice and counsel of the Attorney General of the United States concerning the development, and dissemination to institutions of higher education, of best practices information about campus safety and emergencies.

"(B) The Secretary shall seek the advice and counsel of the Attorney General of the United States and the Secretary of Health and Human Services concerning the development, and dissemination to institutions of higher education, of best practices information about preventing and responding to incidents of domestic violence, dating violence, sexual assault, and stalking, including elements of institutional policies that have proven successful based on evidence-based outcome measurements."; and

(8) by striking paragraph (17) and inserting the following:

"(17) No officer, employee, or agent of an institution participating in any program under this title shall retaliate, intimidate, threaten, coerce, or otherwise discriminate against any individual for exercising their rights or responsibilities under any provision of this subsection.".

(b) EFFECTIVE DATE.—The amendments made by this section shall take effect with respect to the annual security report under section 485(f)(1) of the Higher Education Act of 1965 (20 U.S.C. 1092(f)(1)) prepared by an institution of higher education 1 calendar year after the date of enactment of this Act, and each subsequent calendar year.

# TITLE IV—VIOLENCE REDUCTION PRACTICES

### SEC. 401. STUDY CONDUCTED BY THE CENTERS FOR DISEASE CONTROL AND PREVENTION.

Section 402(c) of the Violence Against Women and Department of Justice Reauthorization Act of 2005 (42 U.S.C. 280b–4(c)) is amended by striking "$2,000,000 for each of the fiscal years 2007 through 2011" and inserting "$1,000,000 for each of the fiscal years 2014 through 2018".

### SEC. 402. SAVING MONEY AND REDUCING TRAGEDIES THROUGH PREVENTION GRANTS.

(a) SMART PREVENTION.—Section 41303 of the Violence Against Women Act of 1994 (42 U.S.C. 14043d–2) is amended to read as follows:

### "SEC. 41303. SAVING MONEY AND REDUCING TRAGEDIES THROUGH PREVENTION GRANTS (SMART PREVENTION).

"(a) GRANTS AUTHORIZED.—The Attorney General, in consultation with the Secretary of Health and Human Services and the Secretary of Education, is authorized to award grants for the purpose of preventing domestic violence, dating violence, sexual assault, and stalking by taking a comprehensive approach that focuses